[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

—————————————

No. 01-14305

—————————————

D. C. Docket No. 97-00333 CR-T-30

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HARRY BOWMAN, a.k.a. Taco, a.k.a. T,

Defendant-Appellant.

—————————————

Appeal from the United States District Court
for the Middle District of Florida

—————————————

**(August 20, 2002)**

Before BIRCH and COX, Circuit Judges, and GEORGE*, District Judge.

PER CURIAM:

———————————

*Honorable Lloyd D. George, U.S. District Judge for the District of Nevada, sitting by designation.

Harry Joseph Bowman, the international president of the Outlaws Motorcycle Club, was convicted of racketeering, conspiracy to murder, and various drug and firearm offenses. He was sentenced to life in prison. He appeals his convictions, contending that the district court erred by refusing to disclose the juror's names and by refusing to redact the Outlaws' Constitution to eliminate the whites-only membership policy. He also challenges the sufficiency of the evidence. We affirm.

## I. BACKGROUND

### A. FACTS

#### 1. *The Outlaws Motorcycle Club*

The Outlaws Motorcycle Club was founded at a bar just outside of Chicago in 1935. It has since grown to include 64 chapters in the United States and chapters in eight other countries. The United States is divided into five regions, and each other country is considered a region. Chapter presidents report to their regional president. The regional presidents report to the international president.

Each chapter has a clubhouse. These clubhouses are used for "church meetings," parties, and privacy, and they are usually secured by concrete walls, steel doors, razor wire, guard dogs, and video surveillance.

The Outlaws profess to be "1%ers," or the one-percent of bikers who have rejected societal norms and dedicated their lives to the club. Membership is limited

to men who own American-made motorcycles of a particular size, and membership

dues are divided between the chapter and the region. A prospective member is first

a "hang-around" or associate. He then becomes a probate and, finally, a patched

member.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

A patched member is entitled to wear a leather or denim vest bearing an

Outlaws emblem, called "colors." The patch is surrounded by chapter and club

membership information, called "rockers." These emblems are purchased directly

from the international president. A patched member is also allowed to attend the

weekly church meetings, while associates, probates, and "old ladies" wait outside.

After being a member in good standing for a year, an Outlaw may wear a tattoo

depicting the Outlaws emblem.

An Outlaw's tattoos can reflect other membership information as well. An

Outlaw who commits murder, attempts murder, or explodes a bomb on behalf of the

Outlaws is entitled to wear "lightning bolts," a Nazi-style "SS" tattoo. An Outlaw

who has spent time in jail may receive an "LL" tattoo, which stands for "Lounge

Lizard."

Membership in the Outlaws has its privileges. The Outlaws maintain a list of

Lounge Lizards, or incarcerated Outlaws, and collect money on their behalf. Chapters

3

also encourage the Lounge Lizards' "old ladies" and fellow Outlaws to send letters to imprisoned members.

While the Outlaws are allied with the Bandidos, a Southwestern motorcycle club, they have rivalries with several other clubs. Their dislike of Hell's Angels is expressed in their slogans "AHAMD," or "All Hell's Angels Must Die," and "ADIOS," or "Angel's Die in Outlaws States." They also dislike the Pagans and the Warlocks.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 29, 2006
THOMAS K. KAHN
CLERK

The Outlaws collect information on their rivalries with other clubs. They primarily collect newspaper clippings regarding incidents with other clubs. On occasion, though, an Outlaws member will bribe a law enforcement officer to obtain information on the location of a rival club's members. Outlaws also travel, at the club's direction, to the funerals of fellow bikers.

### 2. *Harry Bowman*

Harry "Taco" Bowman held various administrative positions within the Outlaws Motorcycle Club. He served as a regional president and national vice-president before becoming international president in 1984. Bowman conducted his presidential activities from the Outlaws clubhouse in Detroit, while living in an affluent Detroit suburb, sending his children to private schools, and driving an armor-plated Cadillac. He served as international president for thirteen years, until 1997.

As international president, Bowman handled matters large and small, from setting the Outlaws' policies regarding other biker gangs to monitoring the activities of members.

For most of Bowman's presidency, Wayne "Joe Black" Hicks was Bowman's right-hand man. In 1984, during the early part of his presidency, Bowman became concerned that a former Outlaw would reveal the whereabouts of an Outlaw fugitive. To alleviate his concerns, Bowman asked Hicks, then the vice president of the Toledo chapter, to kill the former Outlaw. Hicks was unable to complete this assignment because he failed to locate the former Outlaw. Nevertheless, impressed by Hicks's dedication, Bowman transferred Hicks to Florida so Hicks could help revive the Fort Lauderdale chapter. Hicks eventually became chapter president.

As chapter president, Hicks accompanied "Wild" Bill Pilgrim, Florida's regional president, to national meetings of regional presidents. At these meetings, held every couple of months, the regional presidents discussed chapter membership, the status of Lounge Lizards, the Outlaws' community activities, and the activities of rival clubs. Bowman, as international president, chaired these meetings, and the regional presidents were obligated to seek his permission before taking action against rival clubs.

Hicks became Florida's regional president in 1990. At a meeting with Bowman, Hicks reported that Alan "Greaser" Wolfe, an Outlaw, had testified before

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

a grand jury.  Bowman, who distributed Outlaws tee shirts bearing the slogan "snitches are a dying breed," told Hicks to kick Wolfe out of the club and otherwise take care of him.  Hicks and another member revoked Wolfe's membership and beat him.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

### 3. *Murder of Raymond Chaffin*

In the early 1990s, the Warlocks, another Florida club, allied with the Hell's Angels and began selling drugs on their behalf.  This ignited a war between the Outlaws and the Warlocks.  When the Outlaws learned that Raymond "Bear" Chaffin, a former member, was the leader of a Warlocks chapter in Edgewater, Bowman told Hicks to find Chaffin and kill him.  Hicks asked Houston Murphy, the Fort Lauderdale president, to recommend an Outlaw who could gather intelligence on Chaffin.  Murphy recommended Alex "Dirt" Ankerich, an Outlaws probate.  Ankerich traveled to Edgewater and spent the night with Chaffin, who was unaware that Ankerich was affiliated with the Outlaws.

At the next regional presidents meeting, Hicks told Bowman about Ankerich's adventure, and Bowman asked Hicks if Ankerich could be trusted to kill Chaffin.  Bowman then asked Ankerich if he was willing to do anything to become an Outlaw and told Ankerich that he could earn some lightning bolts.  Ultimately, Ankerich and Murphy were directed to kill Chaffin and given a number to call when the murder was

6

complete. Bowman and Hicks then agreed to present themselves in public to establish an alibi.

Murphy and Ankerich arrived in Edgewater on February 21, 1991. Murphy gave Ankerich a .22 pistol equipped with a silencer and told him to aim for Chaffin's head to facilitate the kill. Ankerich went into Chaffin's garage, shot Chaffin four times in the back of the head, and ran away. Murphy reported the murder to Hicks, and Hicks reported it to Bowman, who, in turn, complimented Hicks on his work. Murphy also told Ankerich that he had earned his patch and lightning bolts. Newspaper articles on Chaffin's murder were mailed to other chapters.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

*4. Kidnapping of Irwin Nissen*

In March 1992, during Daytona Bike Week, Irwin "Hitler" Nissen, a former Outlaws probate, got into a fight with James "Moose" McLean, the president of the Outlaws' Atlanta chapter. Bowman heard about the fight and directed Murphy to bring Nissen to him. Christopher "Slasher" Maiale, another Outlaw, placed a lock on Nissen's motorcycle to prevent him from leaving.

The next morning, Dennis "Dog" Hall, an Outlaw, brought Nissen to Bowman's motel room. Bowman greeted Nissen by punching him in the face. Murphy then held Nissen while Bowman put a knife to Nissen's ear and threatened to kill him if he ever raised his hand against another Outlaws officer. Murphy and Maiale, at Bowman's

7

direction, began beating and kicking Nissen until Bowman told them to get rid of him. Murphy then proceeded to push Nissen off of a three-story balcony, which resulted in severe injuries to Nissen, including a broken ankle.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

### 5. *Kidnapping of Kevin Talley*

In 1993, a Florida Outlaws member named Kevin "Turbo" Talley was arrested in Canada while visiting an Outlaws chapter there. Talley was to be deported to Massachusetts, where a warrant for him was outstanding, but Canadian officials first had him sign a statement admitting that the Outlaws were a criminal enterprise. Incensed by Talley's action, Bowman ordered Hicks to bring Talley to Detroit and detain him there. Hicks called Talley in Massachusetts and told him to fly to Detroit. Two Outlaws, "Broda" and "Bolt," met Talley at the Detroit airport. They escorted Talley to the Detroit clubhouse and locked him inside for several days.

Eventually, Bowman and Hicks arrived in Detroit and met with Talley. They told Talley that they were upset that he signed the statement. After the meeting, Hicks told Bowman that he would handle the problem. Hicks sent Talley to Florida, where Hicks planned to beat up Talley and kick him out of the club. Believing he was in danger, Talley resigned his membership upon his return to Florida.

### 6. *1994*

8

On New Year's Eve 1993, Bowman called a meeting of all Outlaws at a party in Fort Lauderdale. During the meeting, Bowman announced that the Outlaws would escalate their hostilities in 1994, showing no tolerance for Hell's Angels or their sympathizers. In the following year, Outlaws nationwide conducted an increased number of attacks on their rival clubs and circulated newspaper articles documenting these attacks.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

### a. The War Wagon Incident

In June 1994, numerous Outlaws descended on Gary, Indiana, to attend an event at a local speedway. This event was also customarily attended by the Invaders, another motorcycle club. The Outlaws suspected that the Invaders were affiliated with the Hell's Angels.

On the night before the event, Bowman met with attending Outlaw presidents. Randy "Mad" Yager, the president of the Gary Outlaws, also held a meeting with the attending Outlaws and announced that they were to attack the Invaders at the speedway. To carry out this attack, the Outlaws planned to use a "war wagon," or a vehicle modified with steel plating and several gun ports. The war wagon was equipped with firearms and other weapons to facilitate the attack.

The Outlaws drove the war wagon to the speedway, but no Invaders ever arrived. After the war wagon left, it was stopped by Gary police officers. The officers seized firearms, ammunition, and smoke grenades from inside the war wagon.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

### b. Hell's Henchmen

While visiting Chicago in the spring of 1994, Bowman complained about the presence of Hell's Henchmen in the area and the failure of the Chicago chapter president, Pete "Greased Lightning" Rogers, to do anything about it. Rogers, it turns out, was reluctant to take action for fear that it might draw the attention of federal authorities. Bowman decided to take matters into his own hands by ordering Hicks and Walter "Buffalo Wally" Posnjak to surveil the Hell's Henchmen clubhouse. Murphy also participated in this surveillance and, on one occasion, observed Hell's Angels memorabilia in the clubhouse. In September, Carl "Jay" Warneke, Yager, and another Outlaw met with Bowman at his Detroit residence, and Bowman gave them permission to bomb the clubhouse.

Then, in November, Outlaws Kevin "Spike" O'Neill and Raymond "Shemp" Morgan Jr. set off a car bomb outside of the Hell's Henchmen clubhouse. The bomb damaged nearby structures, parked cars, and commuters but failed to destroy the clubhouse. The Chicago Outlaws finished the job in December by dousing the clubhouse in gasoline and burning it down. The clubhouse was condemned and put

10

up for sale, and the Outlaws celebrated by visiting the site and giving it "the one-finger salute."

### c. Warlocks

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

Bowman, in 1994, also asked the Outlaws to do anything they could to destroy the Warlocks. Hicks asked Stephen "DK" Lemunyon, a Daytona Outlaw, to determine how best to destroy the Warlocks clubhouse in Orlando. Lemunyon and Steve "Stevo" Hilton, another Outlaw, constructed a bomb, and Hicks kept Bowman informed of the operation. Meanwhile, several Daytona Outlaws kept an eye on the clubhouse.

Lemunyon, Hilton, and Louis Musher detonated the bomb in October 1994. Bowman told the Florida Outlaws that he was proud of their work. Bowman also told Hicks to keep up the good work and to continue to watch and kill the Warlocks.

A few months later, Lemunyon, Musher, Hilton, and Robert Gunther joined forces to plan another firebombing, this time of the Warlocks clubhouse in Brevard County. Again, Outlaws watched the clubhouse while Lemunyon constructed a bomb identical to the one used in Orlando. The plan was thwarted, however, when authorities arrested the Daytona Outlaws and, during a search of Lemunyon's residence, seized the firebomb.

11

*d. Fifth Chapter Motorcycle Club*

The Fifth Chapter Motorcycle Club was a family-oriented club made up of men and women who were recovering from substance-abuse problems. They sought to be neutral, maintaining good relationships with all clubs, and the Outlaws allowed them to exist in Florida, which was generally considered Outlaw turf. But the Outlaws also targeted the FCMC in 1994.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 16, 2002
THOMAS K. KAHN
CLERK

In September of that year, a Hell's Angel named Michael Quale was killed in an altercation with some Outlaws. At Quale's funeral, a photographer took a picture of an FCMC member hugging a Hell's Angel. Bowman believed that this hug was disrespectful to the Outlaws because one of their own, "Buffalo Wally" Posnjak, had also been killed in the altercation. Bowman showed the photograph to Hicks and ordered Hicks to shut down the FCMC in Florida.

In December, Lemunyon invited members of the FCMC to the Outlaws clubhouse in Orlando. About fifteen members of the FCMC accepted the invitation and rode to Orlando. As they entered the compound, the FCMC members were searched by Outlaws.

Once inside, the members were seated at two picnics tables and surrounded by armed Outlaws. Lemunyon then announced that there was a problem, displayed the newspaper photograph, and began beating FCMC national president Mike Malone

12

with a flashlight while the other FCMC members were held at gunpoint. Lemunyon told the FCMC that they could no longer exist and ordered them to remove any clothing that bore the FCMC logo. After the FCMC members complied with Lemunyon's instruction, the Outlaws began beating them as well.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

After the beatings, the Outlaws allowed the FCMC members to wash themselves. They were told to return home without congregating or visiting hospitals. Once home, Lemunyon instructed, the FCMC members were to mail all of their FCMC memorabilia to the Outlaws. The FCMC members returned to their motorcycles to find that many of their personal belongings had been stolen.

### e. Murder of Donald Fogg

At a 1994 meeting in Chicago, Bowman told Hicks and others that an Outlaw had become a snitch. Bowman said that the snitch would be killed and explained that the killing would be made to look like an enemy had done it. He also said that the murdered snitch would be given an Outlaw funeral.

A few weeks later, authorities found the body of Donald Fogg, an Outlaw, lying face down in the snow. Fogg had been shot in the head in a field near an Outlaws clubhouse. Fogg received an Outlaw funeral. At the funeral, a story was circulated that a policeman interested in Fogg's girlfriend had shot him, but none of the Outlaws

13

seemed interested in revenge.  Bowman later acknowledged that Fogg was the snitch he had targeted.  Fogg, it turned out, had been talking to the police.

### f. Hell's Angels

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

At a meeting in 1994, Outlaws regional president "Mad Mike" Markham was criticized for failing to take action against the Hell's Angels.  Markham, however, was reluctant to take on the Hell's Angels because the two clubs had peacefully coexisted in his region.  An Outlaw from Markham's region, Harold "Bullwinkle" Brewington, suggested an alternative: attack the Hell's Angels in California.  Markham liked the idea and told Brewington that he would bring it up at the next regional presidents meeting.

At a meeting near the end of 1994, Bowman, apparently adopting Markham's idea, announced that the Outlaws would take the war against the Hell's Angels to California.  Bowman planned to send a group of trustworthy Outlaws to California to conduct surveillance on, and possibly assassinate, either Sonny Barger, the international president of the Hell's Angels, or George Christie, a national officer.  Ultimately, Murphy and Brewington were selected for the mission, but Murphy, uncomfortable with Brewington, went to California alone.

Murphy stayed in Ventura, California, for four days, locating and mapping out Christie's residence.  He returned to Florida, but, after the Daytona Outlaws were

14

arrested on federal RICO charges, Bowman directed Murphy to bring the map to Tennessee. Murphy presented his report at a meeting in Tennessee, and Bowman thanked him for his service. Eventually, Bowman dispatched other Outlaws to follow up on Murphy's findings, but Christie was never harmed.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

### 7. Other Activities

In addition to his managerial activities, Bowman also, at various times, used and distributed illegal drugs. He was generally accompanied by a bodyguard who carried a gun for him.

Bowman was indicted in 1997. The indictment was unsealed soon thereafter, but the FBI was unable to serve the indictment at Bowman's residence. Bowman then became a fugitive on the FBI's ten-most-wanted list. He was finally captured in 1999, while visiting his family in Sterling Heights, Michigan.

## B. PROCEDURAL HISTORY

### 1. The Indictment

Bowman's indictment includes ten counts. Four counts allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Count One alleges that Bowman conspired to conduct and participate in the affairs of an enterprise affecting interstate commerce through a pattern of racketeering, in violation of 18 U.S.C. § 1962(d). This count includes seventeen alleged racketeering acts. Count

15

Two alleges that Bowman in fact conducted or participated in these affairs, in violation of 18 U.S.C. § 1962(c). Count Four charges Bowman with threatening and assaulting members of the Fifth Chapter Motorcycle Club to maintain and increase his position in the RICO enterprise, in violation of 18 U.S.C. § 1959(a)(3) and (a)(4). Count Five charges him with maintaining and increasing his position by conspiring to murder members of the Hell's Angels Motorcycle Club, in violation of 18 U.S.C. § 1959(a)(5).

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2007
THOMAS K. KAHN
CLERK

Four counts charge Bowman with drug offenses. Count Three charges Bowman with conspiracy to possess with intent to distribute opium, cocaine, methamphetamine, marijuana, and Valium, in violation of 21 U.S.C. § 846. Count Six charges him with distributing methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Count Seven charges him with distributing opium, and Count Eight charges him with distributing Valium.

Count Nine charges Bowman with destroying the Warlocks clubhouse in Orlando, in violation of 18 U.S.C. § 844(i). Count Ten charges Bowman, a convicted felon, with possessing a .45 caliber semiautomatic pistol.

16

## 2.  *Empaneling the Jury*

Bowman proceeded to trial.  Before empaneling the jury, the court sua sponte decided to keep the jury innominate[1] by withholding their names, addresses, and places of employment.  The court explained its decision in a written order, citing prior incidents of Outlaws attempting to interfere with judicial proceedings.  (R.1-63.) Bowman objected, but the jurors remained innominate throughout the trial.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2008
THOMAS K. KAHN
CLERK

## 3.  *Trial and Motions for Judgment of Acquittal*

At the close of the Government's case, Bowman moved for judgment of acquittal on all counts.  The court granted the motion in part, entering judgment of acquittal on Count Seven and on two Racketeering Acts, numbers Five and Six.  The court otherwise denied the motion.  Bowman did not renew his motion at the close of all of the evidence.

The jury found Bowman guilty of Counts One through Six, Eight, and Ten and not guilty on Count Nine.  The jury also found proved Racketeering Acts Two through Four and Seven through Seventeen.  Bowman made a post-verdict motion for judgment of acquittal as to Count Four and Racketeering Acts Two, Eight, Thirteen,

---

[1]We will refer to the jury as "innominate" rather than "anonymous" because, after a thorough voir dire, the parties knew everything about the jurors except their names.  *See United States v. Carpa*, 271 F.3d 962, 963 n.1 (11th Cir. 2001).

17

and Fifteen. (R.2-98.) The court granted the motion as to Racketeering Act Two but otherwise denied it.

Bowman stands convicted on Counts One, Two, Three, Four, Five, Six, Eight, and Ten. He also stands convicted of thirteen racketeering acts: Three is the murder of Raymond Chaffin; Four is the kidnapping of Irwin Nissen; Seven is the distribution of Valium; Eight is the kidnapping of Kevin Talley; Nine is the conspiracy to murder members of other motorcycle clubs; Ten is the bombing of the Warlocks clubhouse; Eleven is the bombing of the Hell's Henchmen clubhouse; Twelve is the conspiracy to destroy the Warlocks clubhouse in Brevard County; Thirteen is the assault on the Fifth Chapter Motorcycle Club; Fourteen is the conspiracy to murder members of the Warlocks; Fifteen is the murder of Don Fogg; Sixteen is the conspiracy to murder members of the Hell's Angels; and Seventeen is the distribution of various illegal substances.

*4. Sentencing*

Bowman was sentenced to concurrent terms of life imprisonment on Counts One and Two. He received twenty years each on Counts Three, Four, and Six, ten years each on Counts Five and Ten, and three years on Count Eight. These sentences were to run concurrently with his life sentence.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2012
THOMAS K. KAHN
CLERK

## II. ISSUES ON APPEAL

Bowman raises three issues on appeal: (1) Whether the district court erred by denying his motion for judgment of acquittal based on insufficiency of the evidence;

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

(2) Whether the district court abused its discretion by empaneling an innominate jury; and (3) Whether the district court abused its discretion by refusing to redact the whites-only statement in the Outlaws Constitution.

## III. DISCUSSION

### A. SUFFICIENCY OF THE EVIDENCE

Bowman made a post-verdict motion for judgment of acquittal, arguing that the evidence was not sufficient to support the jury's guilty verdicts. The district court denied the motion, and Bowman appeals. We review the denial of a motion for judgment of acquittal de novo. *United States v. Perez-Tosta*, 36 F.3d 1552, 1556 (11th Cir. 1994). When the motion raises a challenge to the sufficiency of the evidence, we review the sufficiency of the evidence de novo, drawing all reasonable inferences in the Government's favor. *Id.*[2] A review of the record indicates that the

---

[2]The Government argues that, because the post-verdict motion challenged only a few counts of conviction, we should review the unchallenged counts for "a manifest miscarriage of justice." *United States v. Adams*, 91 F.3d 114, 116 (11th Cir. 1996). In light of our conclusion that the evidence was sufficient on all counts, we need not be detained in a search for the appropriate standard of review.

19

evidence against Bowman was sufficient on all counts of conviction, and only Count Four and Racketeering Acts Eight, Thirteen, and Fifteen warrant discussion.

Count Four and Racketeering Act Thirteen charge Bowman with ordering the assault on members of the Fifth Chapter Motorcycle Club. In support of the count, the Government offered the testimony of Hicks, who was, for a time, Bowman's right-hand man. Hicks testified that, after Bowman saw a picture in the newspaper of an FCMC member hugging a Hell's Angel, Bowman was enraged and told Hicks to return to Florida. (R.15 at 121-22.) Upon Hicks's return to Florida, he was to meet with the FCMC, shove the newspaper in the president's mouth, and shut down the FCMC. (R.15 at 122.) Hicks understood "shut down" to mean the assaults and threats of violence that were issued to the FCMC. (R.15 at 124.) Although the assault was ultimately carried out by Lemunyon rather than Hicks, the jury could infer that Lemunyon was following Hicks's, and thus Bowman's, order. This evidence was sufficient to support the jury's verdict on this count.

Racketeering Act Eight accuses Bowman of participating in the kidnapping of Kevin Talley. Bowman argues that there is no evidence indicating that he ordered the Outlaws to restrain Talley against his will. However, Murphy testified that Bowman issued an order that Talley be brought to Detroit and locked in the Detroit clubhouse. (R.22 at 100.) Hicks and Talley also testified that Talley was indeed brought to the

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

20

Detroit clubhouse and was not free to leave.  (R.15 at 79; R.24 at 75-76.)  This testimony is sufficient to support Bowman's conviction.

Racketeering Act Fifteen concerns the murder of Don Fogg.  Hicks testified that Bowman, at a presidents meeting, reported that there was a snitch among them and that the snitch would be killed.  (R.15 at 124.)  The murder would be staged to appear as if an enemy had committed it, and the Outlaws would hold a regular Outlaws funeral.  (R.15 at 124-25.)  Fogg was murdered, a story was circulated that an enemy had done it, and a regular funeral was held.  (R.15 at 125-26.)  Later, Bowman told Hicks that Fogg was the snitch he had mentioned at the meeting.  (R.15 at 128.)  The jury could reasonably infer from this evidence that Bowman ordered Fogg's murder.

Because the evidence was sufficient on all counts of conviction, we find Bowman's challenge to the district court's denial of his motion for judgment of acquittal to be without merit.

## B.  INNOMINATE JURY

The district court sua sponte decided to empanel an innominate jury and entered an order detailing its reasons.  Bowman objected to the use of an innominate jury and, on appeal, argues that the district court abused its discretion by using one in this case. The district court's decision to empanel an innominate jury is reviewed for an abuse of discretion.  *United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir. 1994).

21

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 2, 2002
THOMAS K. KAHN
CLERK

The district court has the discretion to empanel an innominate jury upon a showing of a combination of several factors, including (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that enhances the possibility that jurors' names may become public and expose them to intimidation or harassment. *Ross*, 33 F.3d at 1520.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

In this case, all of the *Ross* factors were present to some degree. Bowman was accused of being the international president of a motorcycle gang that had a history of violent conduct. The Outlaws, on several occasions, interfered with the judicial process by seeking to intimidate witnesses into not testifying against them and by observing and reporting on the testimony that witnesses did give. Bowman himself was accused of kidnapping Talley and murdering Don Fogg to punish them for their communication with law-enforcement authorities. Furthermore, Bowman was facing a life sentence, and his capture and trial had already garnered a significant amount of publicity. While Bowman argues that the Outlaws had no history of juror intimidation, jurors had been accosted by members of the news media in prior trials

involving the Outlaws.  Under these circumstances, the district court did not abuse its discretion by empaneling an innominate jury.

Bowman argues that the district court nevertheless abused its discretion by failing to give the jury a special instruction regarding the unusual voir-dire procedure. Bowman is correct that the district court gave such an instruction in *Ross* and that the instruction was said to have eliminated any potential prejudice that the procedure might have caused in that case.  *See Ross*, 33 F.3d at 1521-22.  While the jury may have benefitted from a similar instruction in this case, the district court's failure to give the instruction does not warrant reversal.  Because Bowman did not request such an instruction, he waived any right he had to the instruction and may not be heard to complain now absent plain error. *See United States v. Zlatogur*, 271 F.3d 1025, 1030 (11th Cir. 2001) (explaining that failure to request instruction precludes reversal absent plain error which "significantly and substantially" prejudices defendant); *United States v. Vario*, 943 F.2d 236, 241 (2d Cir. 1991) (discussing waiver of instruction on anonymous jury where defendant failed to object to charge given).  In any event, the evidence against Bowman was overwhelming, and the lack of an instruction did not affect his substantial rights.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK

## C.  REDACTION OF THE WHITES-ONLY POLICY

The Outlaws Constitution states that only white males may be members. During its search of various Outlaws clubhouses, the FBI seized copies of the Outlaws Constitution, four of which contained this provision.  In the first indictment against Bowman, the Government included the whites-only policy among its allegations.  The court struck this allegation as irrelevant.  At trial, the Government introduced the seized Constitutions, attempting to show a unity of purpose among the various Outlaws chapters.  Bowman objected to the documents and asked the court to strike the whites-only policy from them. (R.10 at 174-75 & 202; R.12 at 12; R.29 at 6.)  The court refused to do so.  When the Government published the documents on an overhead projector at trial, the whites-only policy was visible to the jury.  (R.10 at 177.)  Bowman argues on appeal that the district court should have stricken the whites-only policy and that its admission was inflammatory and prejudicial.  We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Mills*, 138 F.3d 928, 935 (11th Cir. 1998).

Bowman mounts his attack under Federal Rule of Evidence 403, which states that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 200_
THOMAS K. KAHN
CLERK

24

presentation of cumulative evidence." Fed. R. Evid. 403. Since Bowman was not

charged with any racially-motivated crimes, his allegiance to a racist organization is

not relevant to his guilt or innocence in this case. Still, the repetition of the policy was

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 16, 2004
THOMAS K. KAHN
CLERK

not entirely irrelevant since it tended to show the uniformity of the Outlaws enterprise.

But there was other evidence of this uniformity, as many of the constitutional

provisions were repeated; each of the constitutions for instance, included the

requirements that Outlaws must be twenty-one years-old and own their own

motorcycles. Because it was cumulative, the evidence of the whites-only policy had

limited probative value.

This limited probative value was, in our view, outweighed by the danger of

unfair prejudice. The uneasy racial history of criminal law in the United States has

yielded a simple rule-of-thumb: "There is no place in a criminal prosecution for

gratuitous references to race, especially when a defendant's life hangs in the balance.

Elementary concepts of equal protection and due process alike forbid a prosecutor to

seek to procure a verdict on the basis of racial animosity." *Smith v. Farley*, 59 F.3d

659, 663 (7th Cir. 1995). In this case, the Government, whose interest "is not that it

shall win a case, but that justice shall be done," *Berger v. United States*, 295 U.S. 78,

88, 55 S. Ct. 629, 633 (1935), should have scrupulously avoided the possibility that

the jury's verdict might be clouded by racial issues. Furthermore, the court could

25

have, and should have, prevented the injection of racial issues by simply redacting the whites-only policy.

Nevertheless, the whites-only policy comprised but a single phrase in a single sentence on each of four documents admitted into evidence. Over the course of the trial, these four phrases became buried in the mountain of documentary evidence against Bowman, which included thousands of documents and photographs. Furthermore, over fifty witnesses testified regarding Bowman's criminal activity. Since the evidence against Bowman was overwhelming, and the whites-only policy was but a brief flicker in Bowman's month-long trial, the admission of the policy, while error, did not affect Bowman's substantial rights. *See* Fed. R. Crim. P. 52.

## IV. CONCLUSION

Because we find no reversible error in Bowman's convictions, his convictions are affirmed.

AFFIRMED.

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 20, 2002
THOMAS K. KAHN
CLERK