[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 14-12574; 14-12647

_____

D.C. Docket No. 1:13-cr-00092-WSD-LTW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DONALD R. LAFOND, JR.,
JASON ROBERT WIDDISON,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(April 20, 2015)

Before TJOFLAT, WILLIAM PRYOR, and BALDOCK,[*] Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

These consolidated appeals of Donald R. LaFond, Jr.'s, and Jason Robert

Widdison's convictions for second degree murder, 18 U.S.C. § 1111, require us to

_____

[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting by designation.

decide whether the district court abused its discretion in four rulings: the admission of evidence of the defendants' memberships in gangs; an order that the jurors be identified anonymously; a refusal to give two requested jury instructions about self-defense; and an order that Widdison's hands remain shackled during his sentencing hearing. Widdison and LaFond, both of whom were inmates in a federal prison, attacked Kenneth Mills, another inmate, who died a month later from his injuries. The government presented evidence that Widdison and LaFond were members of white supremacist gangs who attacked Mills, a white inmate, because he refused to take any action to have his black cellmate replaced. Widdison and LaFond responded that they acted in self-defense after Mills drew a knife to attack LaFond. A jury convicted Widdison and LaFond of second degree murder. Both Widdison and LaFond raise the issue about the admission of evidence of their gang memberships, and Widdison raises the other three issues. We conclude that the district court did not abuse its discretion when it admitted evidence of the defendants' memberships in gangs to prove motive or intent, when it ordered that the jurors be identified anonymously to protect their safety, and when it refused to give jury instructions about self-defense that were unsupported by the evidence. We also hold that the constitutional rule against shackling does not apply to a sentencing hearing before a judge. We affirm.

2

## I. BACKGROUND

Widdison and LaFond were cellmates in the special housing unit at the United States Penitentiary in Atlanta, Georgia. Widdison was a member of the Soldiers of Aryan Culture and LaFond was a member of the Aryan Resistance Militia. Mills was also an inmate in the special housing unit and had a black cellmate. When Widdison and LaFond pressured Mills to take actions to have his cellmate replaced, Mills refused.

On March 1, 2011, Widdison and LaFond were sharing a workout cage, and the prison guards placed Mills in the same cage. When Mills turned his back to them, Widdison and LaFond knocked Mills to the ground and repeatedly stomped and kicked Mills on his head and chest. After Mills died from his injuries, a federal grand jury indicted Widdison and LaFond for one count of second-degree murder, 18 U.S.C. § 1111.

Before trial, Widdison and LaFond filed motions in limine to prevent the government from introducing evidence of their gang memberships. Widdison argued that the evidence would violate Federal Rule of Evidence 404, and LaFond argued that it would violate Rule 403. The district court denied both motions because the evidence proved intent, which was "a central issue," and the probative value of the evidence was not substantially outweighed by its prejudice.

3

At the beginning of voir dire, the district court asked the prospective jurors if anyone "would have a hard time" "setting aside any personal beliefs or . . . ideas." Two jurors responded and asked to talk privately. At sidebar, prospective juror number nine asked if "the defendants have a list of [the jurors'] names," and the district court explained that the lawyers, but not the defendants, had the list. The prospective juror explained that she was "very uncomfortable," that she had "see[n] papers being passed back and forth," and that she was "shaking like a leaf."

After the district court excused the juror from sidebar, the district court ruled that the jurors would be identified by only their numbers. Widdison's lawyer objected because the procedure would "give[] the idea that the[] [defendants] are so desperate that . . . no reasonable juror would be asked to give their name, and . . . that just puts a really prejudicial twist on this [trial]." The district court overruled the objection because it did not "know who [the defendants] kn[e]w outside of the courthouse" and "courts have commonly allowed people to be called by their numbers and not their names because of safety concerns."

The district court then continued its sidebar with the attorneys, while the clerk distributed cards with numbers to the jurors. After the district court interviewed four other prospective jurors at sidebar, the district court instructed the prospective jurors to identify themselves by number and explained that this practice was a standard practice to prevent identity theft:

4

[W]e are going to give you a number which we have prepared for you.

This is your juror number as it corresponds to the sheet that we have. But we are asking you not to use any personal information in your responses to questions or otherwise volunteer it, and instead you should refer to your number.

We actually have a standard rule in our court that no personal identifying information in any trial or any proceeding is allowed to be publicly disclosed, and so this is consistent with our policy.

And the origin of the policy, interestingly enough, is identity theft.

Although the jurors were identified by number throughout the remainder of voir dire, the lawyers for each party had a list with the name and number of each prospective juror. The district court later excused prospective juror number nine.

Five witnesses called by the government testified about the defendants' gang memberships, and Widdison admitted that he was a member of a gang. The district court instructed the jury that the evidence was "admitted for the limited purpose of determining the defendants' intent and motive in their altercation with Mr. Mills, and you may use it only for that purpose." The district court repeated this instruction when it charged the jury.

Widdison testified that they acted in self-defense after Mills attacked them with a knife. Widdison testified that, the first time Widdison and LaFond met Mills, Mills told them that he was "trying to catch a new case" because, if he was released, he would be sent to Florida to serve a sentence and "would much rather stay in [federal prison]." In a later conversation, Mills told them that he wanted to

5

"look at the autopsy pictures of the body [he] caught on the streets." This comment "really creeped [Widdison] out." In another conversation, Mills told Widdison and LaFond that he was "just going to kill [his] first cellie" at his next prison. Widdison testified that LaFond responded "Oh, come on, [Mills]. You know the only thing you ever killed was a hard on." Mills "was red in the face" after this comment and "walked off."

Widdison testified that, on the day of the fight, he and LaFond were in a cage on the exercise yard and Mills requested to be put in their cage. Widdison's "heart just started pounding," but neither Widdison nor LaFond objected because other prisoners would have retaliated. After Mills entered the cage, he left them alone. But when Widdison and LaFond finished their workout, they feared that Mills would attack them when they put on handcuffs to leave the cage. Widdison testified that LaFond approached Mills, told Mills that he "was just clowning around" the other day, and asked Mills for his "word that [he] [was]n't going to smash [them] when [they] cuff up." Mills "responded aggressively" and "came . . . towards LaFond with a knife in his hand." Widdison "acted" because he "was terrified": "I knew I had to act now. I mean, there is nowhere to go in a rec cage. If you turn around to run[,] . . . you are going to get . . . stabbed in the back." But as Widdison admitted, no one ever found the knife.

6

Widdison requested two jury instructions. First, Widdison requested the following instruction on no duty to retreat:

> One who is not the aggressor is not required to retreat before being justified in using such force as is necessary for personal defense or in using force that is likely to cause death or great bodily harm if one reasonably believes such force is necessary to prevent death or great bodily injury to oneself or a third person or to prevent the commission of a forcible felony.

*Suggested Pattern Jury Instructions, Criminal Cases, Fourth Ed.*, Council of Superior Court Judges of Georgia, 3.10.13. Second, Widdison requested the following instruction on threats and menaces causing reasonable beliefs of danger:

> Threats accompanied by menaces, though the menaces do not amount to an actual assault, may in some instances be sufficient to arouse a reasonable belief that one's life is in imminent danger or that one is in imminent danger of great bodily injury or that a forcible felony is about to be committed upon one's person.

*Suggested Pattern Jury Instructions*, 3.16.10. The district court rejected both instructions as unsupported by the evidence.

After the jury convicted Widdison and LaFond, the district court held Widdison's sentencing hearing. Widdison's attorney objected to the shackles on Widdison's wrists because Widdison had never misbehaved in the courtroom and the restraints "offend[ed] the dignity of th[e] public courtroom." The district court overruled the objection. It explained that, because there was no longer a jury, it was not concerned about prejudice to Widdison because the restraints would "have no impact at all on [its] sentencing decision." The district court also explained that

7

Widdison was "within five feet" of other people and "the two implements of death that [Widdison] used were his hands and his feet." But because of Widdison's difficulty in writing notes—Widdison had to "lean[] forward with his rear end out of the seat," and it took "him probably twenty seconds to write two words"—the district court ruled that it would "give him additional time [to write,] . . . and if he need[ed] to tell [his attorney] something, [it] w[ould] [allow] that." The district court sentenced Widdison to 380 months in prison and five years of supervised release, and it sentenced LaFond to life in prison.

## II. STANDARDS OF REVIEW

Two standards of review govern these appeals. We review for an abuse of discretion an evidentiary ruling, *United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005), a decision to empanel an anonymous jury, *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1034–35 (11th Cir. 2005), and a decision to shackle a defendant, *Baker*, 432 F.3d at 1245. We review *de novo* the sufficiency of the evidence to sustain a requested jury instruction. *United States v. Calderon*, 127 F.3d 1314, 1329 (11th Cir. 1997).

## III. DISCUSSION

We divide our discussion in four parts. First, we explain that the district court did not abuse its discretion when it admitted evidence of gang memberships to prove Widdison and LaFond's intent and motive. Second, we explain that the

8

district court did not abuse its discretion when it ordered that the jurors be identified anonymously to protect their safety. Third, we explain that Widdison did not submit sufficient evidence to support his two requested jury instructions. Fourth, we explain that the Constitution does not prohibit the shackling of a defendant during a sentencing hearing before a district judge.

### A. The District Court Did Not Abuse Its Discretion when It Admitted Evidence about Widdison's and LaFond's Gang Memberships.

Widdison and LaFond argue that the district court abused its discretion when it admitted evidence of their gang memberships. Widdison argues that the admission of this evidence violated Federal Rule of Evidence 404, and LaFond argues that it violated Rule 403. Neither argument is persuasive.

Rule 404(b) provides that evidence of an "act is not admissible to prove a person's character in order to show that . . . the person acted in accordance with the character," but "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, [or] intent." Fed. R. Evid. 404(b)(1), (2).  To determine whether evidence should be admitted under Rule 404(b), a court applies the following three-part test, which includes an analysis under Rule 403: "(1) the evidence must be relevant to an issue other than the defendant's character; (2) the probative value must not be substantially outweighed by its undue prejudice; [and] (3) the government must offer sufficient proof so that the jury could find that the

defendant committed the act." *United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008) (internal quotation marks and citation omitted).

The district court did not abuse its discretion when it admitted evidence of Widdison's and LaFond's gang memberships, which was relevant to prove their intent and motive. When the defendants pleaded not guilty, the government had the "substantial burden" to prove their intent to commit second-degree murder, *United States v. Edouard*, 485 F.3d 1324, 1345 (11th Cir. 2007) (internal quotation marks and citation omitted), which required proof that they acted "with malice aforethought." Witnesses for the government testified that the members of Widdison's and LaFond's gangs believed that they had "to enforce their political ideology on other white inmates" and that, because Mills had a black cellmate, he had "violat[ed] [the] code . . . [of] racist gangs." This evidence also established Widdison and LaFond's motive. The members of their gangs believed that a white inmate should not share a cell with a black inmate, and this belief "help[s] explain" why Widdison and LaFond attacked Mills, *United States v. Bradberry*, 466 F.3d 1249, 1254 (11th Cir. 2006).

The probative value of the evidence was not substantially outweighed by its undue prejudice. "In evaluating [a] district court's ruling under Rule 403, we view the evidence in the light most favorable to admission, maximizing its probative value and minimizing its undue prejudicial impact." *Id.* at 1253 (citation omitted).

10

The evidence of gang memberships had significant probative value because it established intent and motive. Although the evidence was prejudicial because "membership in [a gang] is likely to provoke strong antipathy," *United States v. Jernigan*, 341 F.3d 1273, 1285 (11th Cir. 2003), the district court lessened the prejudicial impact when it repeatedly instructed the jury to consider the evidence for only the limited purpose of proving intent and motive. *See United States v. Carrodeguas*, 747 F.2d 1390, 1395 (11th Cir. 1984) (stating that we presume that jurors follow the instructions of the district court). Because of the significant probative value and the limiting instruction, the prejudice did not substantially outweigh the probative value of the evidence.

The government also offered ample proof of Widdison's and LaFond's gang memberships. Five witnesses testified that the defendants either admitted their gang memberships or questioned why a white inmate would have a black cellmate. And Widdison admitted that he was a member of a white supremacist gang.

## B. The District Court Did Not Abuse Its Discretion when It Ordered that the Jurors Be Identified Anonymously.

Widdison argues that the district court abused its discretion when it ordered that the jurors be identified anonymously because the government made "no showing . . . as for the need of having an anonymous jury" and the district court did not weigh the factors identified by our precedent. Widdison also argues that the district court abused its discretion because the "instruction [it gave the jury] was

11

not a 'plausible and nonprejudical reason' when viewed in the context in which it was given." Widdison's arguments fail.

"'In general, [a] court should not order the empaneling of an anonymous jury without (a) concluding that there is a strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant to ensure that his fundamental rights are protected.'" *Ochoa-Vasquez*, 428 F.3d at 1034 (quoting *United States v. Ross*, 33 F.3d 1507, 1520 (11th Cir. 1994)). "[A]n anonymous jury may be justified even when the defendant has not attempted to interfere with the current proceedings, if he belongs to a group that has a history of interfering with other judicial proceedings." *Id.* We have suggested five factors that a court may consider to determine if the jury needs protection: (1) whether the defendant is "involve[d] in organized crime," (2) whether the defendant "participat[es] in a group with the capacity to harm jurors," (3) whether the defendant has ever "attempt[ed] to interfere with the judicial process," (4) whether the defendant is facing "a lengthy incarceration [or] substantial monetary penalties," and (5) whether "extensive publicity . . . could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment." *Id.* (quoting *Ross*, 33 F.3d at 1520). And if the district court orders the empanelment of an anonymous jury, it "minimize[s] any

12

prejudicial effect[]" if it "'gives the jurors a plausible and nonprejudicial reason for hiding their identities.'" *Id.* at 1034, 1035 (quoting *Ross*, 33 F.3d at 1520).

Two concerns underlie the limitation on when a district court may empanel an anonymous jury: "(1) that anonymity will inhibit the meaningful exercise of preemptory challenges; and (2) that anonymity will diminish the presumption of innocence by raising the appearance that the defendant is a dangerous person." *Id.* at 1035 (citation omitted). Because the lawyers for each party had a list with the name and number of each prospective juror, Widdison does not argue that the anonymous jury affected his exercise of preemptory challenges. Widdison instead argues that the anonymous jury undermined his presumption of innocence.

At least three factors supported the decision to empanel an anonymous jury. First, both Widdison and LaFond were members of racist gangs. Second, the district court was concerned that the defendants might "know [people] outside of the courthouse" based on their gang affiliations who would have the ability to harm jurors. Third, Widdison and LaFond were facing potential life sentences. Although the district court did not mention our precedents, its analysis makes clear that it "made its decision within the proper . . . framework." *Barber v. Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers, Dist. Lodge No. 57*, 778 F.2d 750, 755 (11th Cir. 1985). Based on these factors, the district court did not abuse its discretion when it ruled that "there [was] a strong reason to

13

believe the jury need[ed] protection." *Ochoa-Vasquez*, 428 F.3d at 1034 (internal quotation marks and citation omitted). And the district court minimized any prejudicial effect when it gave the jurors a plausible and nonprejudicial reason for the use of numbers—that is the district court explained that it was following its "standard rule."

The district court also did not abuse its discretion when it explained that it used the numbers to prevent identity theft. As an initial matter, Widdison never requested a particular instruction nor objected to the instruction of the district court, so "he waived any right he had to the instruction and may not be heard to complain now absent plain error." *United States v. Bowman*, 302 F.3d 1228, 1239 (11th Cir. 2002). Widdison argues that the explanation was not "plausible and nonprejudicial" because the court "abrupt[ly] shift[ed]" to using numbers after "one juror asked to speak in private," but the shift occurred after two jurors asked to speak privately about "personal beliefs" and the district court then had a sidebar with the lawyers. A plausible inference is that one of the lawyers invoked the "standard rule." Because the instruction need be only "plausible," *Ochoa-Vasquez*, 428 F.3d at 1034, the district court did not abuse its discretion, much less plainly err.

*C. The District Court Did Not Abuse Its Discretion when It Rejected Widdison's Two Requested Jury Instructions.*

Widdison argues that the district court abused its discretion when it rejected his requested instructions on no duty to retreat and on threats and menaces causing reasonable beliefs of danger. A defendant has the right to have the jury instructed on a theory of defense only if "there has been some evidence adduced at trial relevant to that defense." *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995). Because the evidence did not support either instruction, the district court did not err.

Widdison argues that the evidence supported a charge on no duty to retreat because "the jury could have thought that [Widdison] should have retreated and wait[ed] for the assistance of the guards," but we disagree. Widdison presented only his testimony to prove self-defense, and the only evidence about retreat was when he explained "I was terrified. I knew I had to act now. I mean, there is nowhere to go in a rec cage. If you turn around to run[,] . . . you are going to get . . . stabbed in the back." The government never suggested that Widdison should have retreated; it argued instead that Widdison's story was contradicted by the evidence. Because neither the government nor the defendants raised the issue of retreat, the district court did not err when it rejected this instruction.

Widdison also argues that Mill's "comments while interacting with [Widdison] prior to the incident, in conjunction with [Mill]'s violent assault,"

15

supported a charge on threats and menaces causing reasonable beliefs of danger, but we again disagree. Widdison testified that he attacked Mills only after Mills told LaFond "Ain't nobody going to tell me what to do" and Mills "came . . . towards LaFond with a knife." This testimony does not establish that Widdison responded to a threat or menace from Mills; it establishes that Widdison responded to an attack on LaFond. The district court did not err when it refused to give this instruction.

## D. The Constitution Does Not Prohibit the Shackling of a Defendant During a Sentencing Hearing before a District Judge.

Widdison argues that the district court abused its discretion when it ordered that his hands remain shackled during his sentencing hearing. Widdison argues that, even though "a jury was not present," he suffered "an indignity" that "his conduct did not merit"; that "shackling is 'inherently prejudicial'"; and that he was prejudiced because "he was unable to write during the sentencing hearing." Widdison's argument fails.

The rule against shackling "has deep roots in the common law." *Deck v. Missouri*, 544 U.S. 622, 626, 125 S. Ct. 2007, 2010 (2005). The common law "forb[ade] routine use of visible shackles during the guilt phase," and "a version of th[at] rule forms part of the Fifth . . . Amendment['s] due process guarantee." *Id.* at 626–627, 125 S. Ct. at 2010–11 (citing *Illinois v. Allen*, 397 U.S. 337, 343–44, 90 S. Ct. 1057, 1060–61 (1970)). For that reason, the Supreme Court held in *Deck* that

16

"the Fifth . . . Amendment[] prohibit[s] the use of physical restraints visible to the jury absent a trial court determination . . . that they are justified by a state interest specific to a particular trial." *Id.* at 629, 125 S. Ct. at 2012.

Widdison's argument fails because his sentencing hearing occurred before only a district judge, not when a jury was present. Blackstone, for example, explained that the common-law rule applied only at trial:

> [I]t is laid down in our ancient books that, though under an indictment of the highest nature, [a defendant] must be brought to the bar without irons . . . . But . . . a difference was taken between the time of arraignment and the time of trial; and accordingly the [defendant] stood at the bar in chains during the time of his arraignment.

4 William Blackstone, Commentaries *321 (footnotes omitted); *see also Trial of Christopher Layer*, 16 How. St. Tr. 94, 100–01 (K.B. 1722) ("No doubt when he comes upon his trial, the authority is that he is not to be 'in [chains]' during his trial . . . . Here he is only called upon to plead by advice of his counsel; . . . when he comes to be tried, if he makes that complaint, the Court will take care he shall be in a condition proper to make his defence . . . ."). And the Supreme Court made clear in *Deck* that the rule "was meant to protect defendants appearing at trial before a jury." 544 U.S. at 626, 125 S. Ct. at 2011 (citing *King v. Waite*, 1 Leach 28, 36, 168 Eng. Rep. 117, 120 (K.B. 1743)); *see also id.* at 630, 125 S. Ct. at 2013) (explaining that the rule against shackling arises, in part, from "the presumption of innocence," which "[v]isible shackling [would] undermine[]").

17

"American courts have traditionally followed Blackstone's 'ancient' English rule," *id.* at 626–27, 125 S. Ct. at 2011 (collecting cases), and the Second Circuit has held that the rule does not apply to sentencing proceedings without a jury, *United States v. Zuber*, 118 F.3d 101, 102 (2d Cir. 1997) ("[T]he rule that courts may not permit a party to a jury trial to appeal in court in physical restraints without first conducting an independent evaluation of the need for these restraints does not apply in the context of a non-jury sentencing hearing."). Because the rule against shackling pertains only to a jury trial, we hold that it does not apply to a sentencing hearing before a district judge.

## IV. CONCLUSION

We **AFFIRM** Widdison's and LaFond's convictions and Widdison's sentence.

18