[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10258

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

THOMAS MUNNE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cr-20182-RNS-1

_____

Before ROSENBAUM, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

A jury convicted Thomas Munne of committing and conspiring to commit Hobbs Act robbery, both in violation of 18 U.S.C. section 1951(a). He now appeals the convictions and his 168-month sentence. After careful review, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### *The Robbery*

Before his Hobbs Act convictions, Munne did two things for a living: construction work and manufacturing marijuana vape pens. Munne's distributor was named "Arturo." At Arturo's house, Munne met another vape-pen distributor, Navit Cabrera. Cabrera's practice was to buy vape pens from Arturo and then re-sell them to customers at higher prices. That was good for Munne because he received a share of the profits from Arturo's sales to Cabrera. But the money flow stopped. Cabrera discovered that he could make more money by being both a manufacturer and distributor, so he branched out on his own—cutting out Arturo and Munne.

After Munne found out that Cabrera was "copycatting" him, he recruited a friend in California—Anrry Morales-Leiva—to rob Cabrera's mom's house. Munne and Morales-Leiva had known each other for about fifteen years. Morales-Leiva flew down to Miami, Florida at Munne's expense, and he stayed at a hotel room

rented for him by Munne.  He and Munne discussed two potential plans for the robbery.  The first plan was simply jumping the fence of the mom's gated residential community to reach the house.  The second, or "Plan B," was renting a car that looked like an undercover cop car, pulling Cabrera over during a fake traffic stop, and then using Cabrera to get through the gates.  According to Morales-Leiva, Munne wanted to go with the first plan because it "would be maybe easier than going through the headache of imitating a police officer and pulling [Cabrera] over as a police officer."

The first plan proved too difficult after surveilling the gated community, so Morales-Leiva recommended that Munne go with Plan B.  Munne and Morales-Leiva recruited a man named "Andy" to help carry it out.  Munne also helped Morales-Leiva and Andy prepare for the robbery.  He rented a grey Chevy Malibu because it looked like a police car and gave Morales-Leiva money to buy the necessary gear.

When Munne gave Morales-Leiva the money, Morales-Leiva told Munne he needed a gun and Munne told him to buy one.  Morales-Leiva later bought a handgun from a friend named "Panama."  He bought the other gear, as instructed by Munne, at a store called the "Spy Shop."  Morales-Leiva used more than $1,500 of Munne's money to buy strobe lights for the car, police clothes and badges, and a GPS tracker to place on Cabrera's black Ford F-250 truck.  He bought the GPS tracker so that they could "know exactly what [Cabrera's] location was going to be" when

they wanted to pull him over.  Munne told Morales-Leiva where he could find the truck and place the device.

On August 4, 2020, Morales-Leiva and Andy carried out the robbery as planned.  While Cabrera was driving, Morales-Leiva and Andy used the GPS tracker to find his truck.  They followed the truck onto a highway while Morales-Leiva kept Munne updated through WhatsApp, telling Munne that they were about to "pull [Cabrera] over."  Morales-Leiva and Andy then turned on the strobe lights.

The impersonation strategy worked—when Cabrera saw the lights, he thought that the grey car was a cop car and pulled over to the side of the road.  Morales-Leiva and Andy, dressed as cops, got out of the car, walked up to Cabrera's truck, and demanded that he exit it.  Cabrera refused to exit his truck, so the two men pulled him out of it.  That's when the fake traffic stop took a violent turn—Morales-Leiva and Andy held Cabrera down, handcuffed him, zip-tied his legs, repeatedly punched his face and chest until he almost passed out, and threw him into the back of his truck.  Morales-Leiva also threatened Cabrera with the handgun.

Morales-Leiva took the driver's seat of Cabrera's truck. Andy returned to the grey car, and then both vehicles left the scene. Morales-Leiva called Munne as they "started driving away," telling Munne that Cabrera "was in the back, that he was tied up, zip tied." Munne told Morales-Leiva to keep him updated and "to be careful."

After ditching the rental car near a church, Morales-Leiva and Andy headed for Cabrera's mom's house in the F-250. Cabrera kept his vape-pen profits there in a safe. Cabrera didn't need to give Morales-Leiva the address or any directions; Morales-Leiva already knew where the house was. Morales-Leiva did ask Cabrera what he should "say at the guard gate" on the way there. Once the group arrived, Cabrera told the gate guard to let the truck pass through.

Plan B proved successful again—the guard let the truck pass, so Morales-Leiva and Andy went to the house and grabbed the safe. They found more than two hundred thousand dollars inside it after returning to the rental car, plus some cocaine. Morales-Leiva and Andy then left Cabrera with his truck and the handcuff keys, taking off in the rental car with the money. Morales-Leiva counted the money, split it up, and delivered Munne's share to his house.

Morales-Leiva testified that he, Munne, and Andy "were all happy that everything went smooth." But Morales-Leiva and Andy made a critical mistake during the robbery—they left the GPS tracker on Cabrera's F-250. Law enforcement was able to extract data from the tracker, which ultimately led investigators to Morales-Leiva and Munne.

*Morales-Leiva's Trial Testimony*

Morales-Leiva was indicted first. He pleaded guilty to carjacking and brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. sections 2119(1) and 924(c). As part

of his plea agreement, he agreed to cooperate with the government.  He was sentenced to 214-months' imprisonment.

A grand jury later indicted Munne for conspiring to commit Hobbs Act robbery, in violation of section 1951(a), committing Hobbs Act robbery, in violation of sections 1951(a) and 2, and carjacking, in violation of sections 2119(1) and 2.  Munne pleaded not guilty, and the case was set for trial.

The government filed a notice pursuant to Federal Rule of Evidence 404(b) that it intended to have Morales-Leiva testify about these facts at trial:  (1) Munne and Morales-Leiva stole more than fifty ATMs together between 2005 and 2015; (2) Munne stole several more ATMs with an man initialed "E.C."; (3) Munne was a marijuana distributor; (4) Munne intended to use the robbery money to fund cocaine distribution; and (5) Munne committed the robbery because he thought Cabrera burglarized his house.  The government maintained it didn't offer this evidence to prove Munne's character or criminal propensity; instead, in the government's view, the evidence established identity, intent, motive, and facts that were inextricably intertwined with the charged offenses.  Munne argued the evidence should be excluded because it only showed propensity and, alternatively, it was unfairly prejudicial under Federal Rule of Evidence 403.

Over Munne's opposition, the district court ruled most of the evidence would be admissible at trial.  It excluded any testimony about Munne's ATM thefts with E.C.  But Munne's ATM thefts with Morales-Leiva, the district court found, were

inextricably intertwined with the charged offenses because they tended to show why Munne chose and trusted Morales-Leiva as a coconspirator. The district court concluded the remaining evidence was admissible under rule 404(b)(2) to show Munne's motive for committing the charged offenses.

The district court also overruled Munne's rule 403 objections. To that end, it found the evidence's probative value wasn't substantially outweighed by undue prejudice. It also reasoned that other safeguards would protect against any prejudice. The district court explained that it would limit Morales-Leiva to testifying that "more than five" ATM thefts were committed, and that Munne could request additional limiting instructions to the jury. The district court also wrote that Munne could cross examine Morales-Leiva about his mental health struggles to undermine the government's proof that the other acts actually happened.

Over Munne's renewed objections during trial, Morales-Leiva testified to the facts described in the government's rule 404(b) notice. For instance, Morales-Leiva testified that he and Munne stole more than five ATMs between 2005 and 2015, he and Munne split the stolen ATM money, and Munne "kept doing" the ATM thefts after Morales-Leiva was arrested in 2015. Morales-Leiva also testified Munne "was involved in selling marijuana." The district court instructed the jury that this testimony was only admissible to establish Munne's relationship with Morales-Leiva and his motive.

Morales-Leiva also testified about Munne's recruitment of him for the robbery. Specifically, Munne told Morales-Leiva that he and Cabrera "had an argument," that Cabrera "stole some of the [vape-pen] clientele," that Cabrera burglarized Munne's house, and that Munne "wanted to get back at [Cabrera]." Munne also "dream[ed]" of starting a cocaine pipeline from California to Florida. According to Morales-Leiva, Munne "would say that anybody that is doing illegal crimes, that is living, not the proper life, always had that dream of the Scarface movie and let's sell some coke."

Besides the facts specified in the government's rule 404(b) notice, the district court—over Munne's objection—allowed Morales-Leiva to testify about an incident that happened before he was set to testify on the second day of trial. According to Morales-Leiva, he and Munne were "[a]t the building . . . where [they we]re incarcerated[,] across the street" from the courthouse. Munne told Morales-Leiva "that [he] didn't need to do this," that Munne "would take care of [Morales-Leiva's] kids and that he would take care of [Morales-Leiva]" while in jail, and "to not say nothing." The district court instructed the jury that it could consider the conversation, but not where it took place.

The jury heard testimony from several other witnesses and returned a verdict finding Munne guilty of Hobbs Act conspiracy and robbery. It acquitted him of the carjacking charge.

*Sentencing*

The probation office prepared a presentence investigation report and recommended a base offense level of 20. The base level

was increased five levels under United States Sentencing Guidelines section 2B3.1(b)(2)(C) because Munne's coconspirator possessed a firearm during the offenses, two levels under section 2B3.1(b)(3)(A) because a victim sustained bodily injury, four levels under section 2B3.1(b)(4)(A) because a victim was abducted to facilitate commission of the offenses, and two levels under section 2B3.1(b)(5) because the offenses involved carjacking. Those enhancements, plus two others for obstruction of justice and the robbery involving a $210,000 loss, resulted in a total adjusted offense level of 37 and guideline imprisonment range of 210 to 240 months.

Munne objected that the first four enhancements didn't apply. He argued they couldn't apply because the jury acquitted him of carjacking and the only evidence that Morales-Leiva possessed a firearm, injured Cabrera, and abducted Cabrera related to the carjacking, not the home invasion. The district court sustained the objection as to the carjacking enhancement. However, it overruled Munne's other objections. The district court concluded that the firearm, injury, and abduction enhancements applied because it was reasonably foreseeable to Munne that Morales-Leiva would use a firearm, injure Cabrera, and abduct Cabrera in furtherance of the robbery conspiracy. "[I]t was clearly foreseeable," the district court explained, that Morales-Leiva and Andy "were going to abduct the victim and take him to his house and make him open a safe, [and] that he was injured during that," even putting the carjacking aside.

The district court's rulings resulted in an adjusted offense level of 35 and an advisory guideline range of 168 to 210 months' imprisonment. The district court imposed a 168-month sentence. It explained that it considered all of the 18 U.S.C. section 3553 factors and the 214-month sentence of Morales-Leiva, who "ha[d] much greater involvement in the case[] and [a] much more serious criminal background."

After Munne was sentenced, Morales-Leiva's sentence was reduced from 214 months to 75 months.

## DISCUSSION

Munne appeals his convictions and his sentence. We address his arguments as to each in turn.

*Morales-Leiva's Trial Testimony*

As to his convictions, Munne argues he is entitled to a new trial because the district court shouldn't have admitted Morales-Leiva's testimony about the ATM robberies, Munne's marijuana vape-pen manufacturing, Munne wanting to "get back at" Cabrera for burglarizing his home, Munne's "dream" of starting an interstate cocaine pipeline, and Munne's exchange with Morales-Leiva on the second day of trial. Morales-Leiva's testimony, Munne

maintains, was inadmissible propensity evidence.  We find no abuse of discretion.[1]

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts" is inadmissible to prove character or propensity, but it is admissible for other purposes.  Fed. R. Evid. 404(b); *see also United States v. Chavez*, 204 F.3d 1305, 1316–17 (11th Cir. 2000) (explaining that evidence is admissible under rule 404(b) if relevant for a non-propensity purpose, a jury can find the prior act happened, and the evidence satisfies rule 403).  Non-propensity purposes include, among others, proving motive, opportunity, intent, preparation, or plan.  Fed. R. Evid. 404(b)(2).

Evidence falls outside the scope of rule 404(b)'s prohibition if it is "intrinsic" to the charged offenses.  *United States v. Estrada*, 969 F.3d 1245, 1274 (11th Cir. 2020) (noting that rule 404(b) applies to "extrinsic" evidence).  Intrinsic facts include uncharged acts that "arose out of the same transaction or series of transactions as the charged offense," are "necessary to complete the story of the crime," or are "inextricably intertwined with the evidence regarding the charged offense."  *Id.* (quoting *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007)); *see Edouard*, 485 F.3d at 1344 ("Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive[,] and set-up of the crime, is properly admitted if linked in time and circumstances with the

---

[1] We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006).

charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." (citation omitted)).

The district court did not abuse its discretion by allowing Morales-Leiva's testimony about his ATM robberies with Munne. We and other circuits have held that facts showing why coconspirators agree to commit crimes with one another are intrinsic to a charged conspiracy. *See United States v. Richardson*, 764 F.2d 1514, 1521–22 (11th Cir. 1985) (reasoning that coconspirator's testimony about "previous cocaine dealings with [a defendant]" were admissible to explain "why he had turned to [that defendant] rather than some other person to obtain . . . cocaine" during the charged offenses); *United States v. Foster*, 889 F.2d 1049, 1053 (11th Cir. 1989) (reasoning that past drug transaction "was necessary to explain why [the witness] agreed to carry" drugs for the defendant in the later charged transaction); *see also, e.g.*, *United States v. Gougis*, 432 F.3d 735, 742 (7th Cir. 2005) (reasoning evidence of drug conspirator's "prior theft of a watch" was admissible to show "his relationship with two of his three coconspirators"). The ATM robberies were relevant for that purpose here. As the district court explained, Munne and Morales-Leiva's ATM robberies showed they had a past, successful working relationship, which "contextualize[d] why Munne chose [Morales-Leiva] to be [a] co-conspirator," flew Morales-Leiva down from California, rented him a hotel room, and trusted him to carry out the robbery without keeping Cabrera's money for himself. Without evidence of the ATM robberies, the jury would have been left to guess about why Munne "turned to"

Morales-Leiva and invested so substantially in recruiting a Californian for a Florida robbery. *See Richardson*, 764 F.2d at 1521–22.

The district court also reasonably found that Morales-Leiva's testimony about Munne's involvement in selling marijuana, Munne's suspicions about Cabrera's burglary, and the "dream" of funding an interstate cocaine operation was admissible to prove Munne's motive. That Cabrera was a rival marijuana dealer who burglarized Munne's home showed why Munne targeted him instead of a random victim—Munne wanted payback against a competitor. *See United States v. LaFond*, 783 F.3d 1216, 1222 (11th Cir. 2015) (concluding evidence of defendants' gang memberships was admissible to prove why they attacked a particular victim). Beyond showing a personal vendetta, the evidence also tended to show a monetary motive. Munne was losing money to Cabrera, who was no longer buying Munne's vape pens and was stealing Munne's clientele. So Munne, knowing Cabrera was raking in drug money, wanted Cabrera's money to buy California cocaine for distribution in Florida.

Lastly, Morales-Leiva's offer to "take care of" Morales-Leiva and his family in exchange for not testifying was relevant for a non-propensity purpose. It tended to show Munne's consciousness of guilt. *See United States v. Mendez-Ortiz*, 810 F.2d 76, 79 (6th Cir. 1986) (explaining that "evidence [a] defendant attempted to bribe and threatened a witness[] is admissible to show consciousness of guilt"); *cf. United States v. Corbin*, 734 F.2d 643, 655–56 (11th Cir. 1984) (concluding testimony that defendant "offered [a witness]

$35,000 if he would not turn . . . marijuana over to authorities" was probative of state of mind).

The propensity theory aside, Munne contends Morales-Leiva's testimony should have been excluded for three other reasons.  First, he contends that the government failed to prove the other acts actually happened by a preponderance of evidence.  The government didn't do so because, in Munne's view, it relied solely on Morales-Leiva's uncorroborated testimony.  This argument misses the mark because corroborating evidence wasn't required.  We've held that a single witness's "uncorroborated testimony" can be sufficient to prove other acts' existence, so long as the testimony is based on "personal knowledge of [the defendant]'s conduct." *United States v. Barrington*, 648 F.3d 1178, 1187 (11th Cir. 2011) (citing *United States v. Duran*, 596 F.3d 1283, 1298 (11th Cir. 2010)).  Munne offers no basis to conclude Morales-Leiva—one of the co-conspirators—lacked such knowledge.

Second, Munne contends the district court should've excluded Morales-Leiva's testimony under rule 403.  To that end, he maintains that the testimony wasn't highly probative because the ATM thefts between 2005 and 2015 were too remote from his 2020 offense conduct.  He also contends that none of the other acts were sufficiently similar to his offense conduct.  But, like the ATM thefts, we have found that acts predating the offense conduct by fifteen years weren't too remote. *See United States v. Lampley*, 68 F.3d 1296, 1300 (11th Cir. 1995).  And as for similarity, we have explained that prior and charged acts need not be similar when the prior acts are

proffered, as here, to show motive. *United States v. Beechum*, 582 F.2d 898, 911 n.15 (5th Cir. 1978) ("[O]verall similarity is not required when the offense is introduced to show motive.").

In any event, the district court gave several limiting instructions—both during the trial testimony and when the case was submitted to the jury. These instructions cured any prejudice caused by Morales-Leiva's testimony about the facts specified in the government's rule 404(b) notice and his reference to Munne being in custody. *See United States v. Spoerke*, 568 F.3d 1236, 1251 (11th Cir. 2009) (finding that limiting instructions cured any unfair prejudice from other-act evidence). Under these circumstances, and considering that rule 403 is an "extraordinary remedy" that "should be used sparingly," *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) (citation omitted), we find no abuse of discretion in the district court's refusal to exclude the evidence here.

### *Munne's Sentence*

Next, Munne challenges his sentence on two grounds. First, Munne contends the district court should not have enhanced his sentence for Morales-Leiva's possession of a firearm, Cabrera being injured, and Cabrera being abducted. Second, he asserts substantive unreasonableness because the district court considered acquitted conduct (the carjacking) and wouldn't have imposed a 168-

month sentence if it knew Morales-Leiva's sentence would be reduced to 75 months.  Neither ground warrants resentencing.[2]

### The Relevant Conduct

We begin with the enhancements.  Guideline section 1B1.3(a)(1)(B) requires that a sentence be based on all relevant conduct attributable to the defendant.  *See United States v. Maddox*, 803 F.3d 1215, 1221 (11th Cir. 2015).  As relevant here, conduct attributable to a defendant in cases of "jointly undertaken criminal activity" includes "all acts" that were within the scope of criminal activity, in furtherance of it, and reasonably foreseeable in connection with it.  U.S.S.G. § 1B1.3(a)(1)(B).  The government must prove those elements by a preponderance of evidence.  *See United States v. Cover*, 199 F.3d 1270, 1274 (11th Cir. 2000), *superseded by regulation on other grounds as noted in United States v. Diaz*, 248 F.3d 1065, 1107 (11th Cir. 2001).

The district court's finding that Morales-Leiva's firearm possession, injuring of Cabrera, and abduction of Cabrera were reasonably foreseeable acts within the scope and in furtherance of the joint criminal activity wasn't clearly erroneous.[3]  Our decisions in *Maddox* and *Cover* are instructive.

---

[2] We review for an abuse of discretion the procedural and substantive reasonableness of a sentence. *United States v. Villarreal*, 613 F.3d 1344, 1357–58 (11th Cir. 2010).  We review for clear error the district court's findings of fact. *Id.*

[3] Munne suggests the district court "made no findings regarding the scope of activity," but, even if that's true, we will not vacate a defendant's sentence for

The *Maddox* defendant and his accomplice attempted to rob a drug store. 803 F.3d at 1217. While the defendant was serving as the look-out, his accomplice forced the store manager into an office at gunpoint and hit him with the gun. *Id.* The jury convicted the defendant of aiding and abetting attempted robbery but acquitted him of aiding and abetting firearm possession during a crime of violence. *Id.* And, despite the partial acquittal, we affirmed the district court's application of enhancements for brandishing a firearm and the victim being injured. *Id.* at 1220–24. We explained the accomplice's conduct was attributable to the defendant because the joint activity was robbery, the firearm was brandished during and in furtherance of it, and, as for foreseeability, the defendant knew the accomplice had a gun. *Id.* at 1221–22.

The *Cover* defendant and his accomplices robbed a bank, and one of the accomplices escaped the scene. 199 F.3d at 1272–73. During his escape, the accomplice carjacked a motorist at gunpoint. *Id.* We rejected the defendant's argument that the carjacking and abduction weren't attributable to him because the robbers didn't expressly plan to carjack or abduct anyone; it was enough, we explained, that the carjacking and abduction were reasonably foreseeable. *Id.* at 1274–75.

The record here presents similar facts to *Maddox* and *Cover*. The joint criminal activity was robbery (plus a conspiracy to rob),

---

"a failure to make specific findings" if the district court's determination is supported by the record. *United States v. Baldwin*, 774 F.3d 711, 727 (11th Cir. 2014).

and Cabrera was the target.  It's undisputed that Morales-Leiva possessed a handgun.  His possession and brandishing of it was within the scope of the joint activity and to further it—Morales-Leiva threatened Cabrera with the gun to subdue, restrain, and ultimately use him to access the gated community.  Moreover, the possession was foreseeable to Munne because Morales-Leiva not only told Munne he needed a gun for the robbery, but Munne told him to buy one.  *See Maddox*, 803 F.3d at 1222 (reasoning that the defendant's knowledge of his accomplice's firearm possession during the offense supported foreseeability).  "[I]t makes perfect sense that he could . . . reasonably anticipate [Morales-Leiva] might well show that gun" to Cabrera to complete the robbery.  *See id.* (noting that is "the primary purpose of bringing a gun to a robbery").

Likewise, the beating and abduction of Cabrera were reasonably foreseeable acts within the scope and in furtherance of the joint activity.  Munne himself approved Morales-Leiva's "Plan B" of impersonating cops to follow Cabrera's truck, rented the car because it could pass as a cop car, and paid for the gear.  The whole point of Plan B was to gain easier access to Cabrera's gated community because jumping the fence proved infeasible.  It was reasonably foreseeable that Morales-Leiva and Andy would take Cabrera and use him to gain easy access through the gate itself, even if Munne didn't tell them to do that, and it was just as foreseeable that the traffic stop could get violent once Cabrera discovered Morales-Leiva and Andy weren't real cops.  *Cf. Cover*, 199 F.3d at 1275 ("The fact that the co-conspirators agreed to a plan that did not involve carjacking or abduction d[id] not preclude the district

court from finding that carjacking and abduction were reasonably foreseeable if the original plan went awry . . . ." (marks and citation omitted)); *Maddox*, 803 F.3d at 1222 (explaining the defendant could've foreseen his "erratic coconspirator" might have used his gun "on anyone who thwarted his efforts to obtain the sought-after money").

In short, the record supported the district court's determination that Morales-Leiva's firearm possession, plus his injuring and abduction of Cabrera, were attributable to Munne.

## Substantive Reasonableness

We end with Munne's argument that his sentence is substantively unreasonable. When assessing substantive reasonableness, we consider the totality of circumstances. *United States v. Grushko*, 50 F.4th 1, 19 (11th Cir. 2022). "We will vacate a sentence only if we are left with the 'definite and firm' conviction that the district court committed a clear error of judgment in weighing the [section] 3553(a) factors by arriving at a sentence that is outside the range of reasonable sentences dictated by the facts of the case." *Id.* (citation omitted).

We aren't left with a definite and firm conviction here that the district court committed a clear error of judgment. The district court stated that it considered all of the section 3553(a) factors and it imposed a 168-month sentence. The sentence wasn't unreasonable considering it was at the bottom of the guideline range and six years below the twenty-year statutory maximum for Hobbs Act offenses. *See* 18 U.S.C. § 1951(a). Plus, Munne's conduct was

serious—he flew Morales-Leiva in from across the country to violently rob a competing drug manufacturer, funding and orchestrating the crime from behind the scenes the entire time.

Munne argues that the sentence is unreasonable for two reasons. The first is that the district court considered the carjacking, which he was acquitted of. But the district court didn't consider the carjacking acquittal. Instead, the court considered the reasonably foreseeable conduct stemming from the Hobbs Act robbery conspiracy in which Munne had been found guilty—that a firearm would be used, that the victim would be abducted, and that the victim would sustain bodily injury.

Second, Munne contends the district court did not adequately consider the need to avoid sentencing disparities because it didn't know Morales-Leiva's sentence would be reduced to 75 months. Besides an unsupported assertion that the government "kept from the [district] court" that it would move to reduce Morales-Leiva's sentence, this argument assumes that Morales-Leiva's sentence reduction actually resulted in a disparity. There is no disparity because Munne and Morales-Leiva aren't similarly situated defendants. Morales-Leiva pleaded guilty and cooperated with the government. Munne didn't, and the district court found he actually obstructed justice by lying during his trial testimony. *See United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) ("[I]t would seem patently unreasonable to endorse a regime in which a defendant could steadfastly withhold cooperation from the authorities

23-10258               Opinion of the Court                 21

and then cry foul when a coconspirator benefits from rendering substantial assistance to the government." (citation omitted)).

## CONCLUSION

Because the district court's evidentiary rulings and sentence weren't abuses of its discretion, Munne's convictions and sentence are **AFFIRMED.**