[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10579

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOHN R. MOORE, JR.,
TANNER J. MANSELL,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:22-cr-80073-DMM-2

_____

Before WILSON, GRANT, and LAGOA, Circuit Judges.

WILSON, Circuit Judge:

Defendants-Appellants John Moore, Jr., and Tanner Mansell jointly appeal their convictions for theft of property within special maritime jurisdiction, in violation of 18 U.S.C. § 661. Their sole argument centers on the district court's refusal to give their requested jury instruction—that the jury must find that Moore and Mansell stole the relevant property for the use or benefit of themselves or others, i.e., *lucri causa*, to convict them under § 661. After careful review, and with the benefit of oral argument, we affirm.

## I.    Background

Moore and Mansell worked as boat crew for a company that facilitated shark encounters in Jupiter, Florida. On August 10, 2020, the Kuehl family was taken out by Moore and Mansell to snorkel with sharks. During the trip, Moore and Mansell spotted a long fishing line attached to a marked buoy, which they hauled into the boat with the help of the Kuehls. The Defendants told the Kuehls they had stumbled upon an "illegal longline fishing line," and there were sharks caught on the line. In the process of gathering the line into the boat, Moore and Mansell cut the sharks caught in the hooks free.

Unbeknownst to Moore and Mansell, the line was properly placed. Scott Taylor, who ran a seafood-distribution business and was the owner of *Day Boat III*, had received the proper permit with the National Oceanic and Atmospheric Administration to conduct shark research. The *Day Boat III* was specially rigged for such work.

As part of its research, the boat used a main line with attached hooks for catching sharks and fish that was weighed down to the sea bottom using anchors and connected to buoys, one of which was far off from the boat. Taylor explained at trial that, after the *Day Boat III* returned from a trip on August 10, 2020, it had lost certain bits of its gear.

While retrieving the line, Moore and Mansell encouraged the Kuehls to record what was happening. Moore also called Barry Partelow, a Florida Fish and Wildlife Officer at the time of the incident, to notify him of their activities and their alleged finding—illegal fishing in federal waters. Moore told Partelow he found sharks attached to hooks and cut them off the line.

Later, Partelow encountered Moore and saw that the floor of his boat was covered with fishing line, hooks, and fresh bait, but did not see any buoys. After receiving a call from an unknown individual, who reported that they had seen the commercial boat suspected of engaging in the illegal fishing, Partelow investigated the boat. It turned out to be the *Day Boat III*, and Partelow determined that it had all the proper permits. He then reached out to Moore so that he could inspect the fishing line, and Moore told him it had been thrown into a dumpster at a nearby marina. Special Agent Benjamin Boots of the National Oceanic and Atmospheric Administration's Office of Law Enforcement confirmed that the *Day Boat III* had the appropriate permit for the type of fishing it had been engaged in. The instant case ensued.

Moore and Mansell were indicted by grand jury for one count of theft of property within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 661. The indictment alleged that they were operating a charter vessel engaged in "conducting trips for snorkelers and scuba divers to view sharks in federal waters offshore of Jupiter, Florida" when they "with the intent to steal and purloin, did take and carry away the personal property of another . . . having a value exceeding $1,000." Moore and Mansell jointly proceeded to trial.

Moore and Mansell submitted proposed jury instructions to the district court. Among the instructions, they requested the following for the description of the elements of § 661: "It's a federal crime for anyone to take and carry away, with the intent to steal or purloin, any property worth more than $1,000 and belonging to another, when the offense is committed within the special maritime and territorial jurisdiction of the United States." They also requested that the court define "to 'steal' or 'unlawfully take'" as "to wrongfully take good[s] or property belonging to someone else with intent to deprive the owner of the use or benefit permanently or temporarily and to convert it to one's own use or the use of another." Further, they requested the following theory-of-the-defense instruction:

> It is the defense's theory of the case that when a defendant removes and brings to the attention of law enforcement, property that he erroneously believes was being unlawfully used, posing an unreasonable danger to maritime life, he has not acted with the

> intent to steal or purloin and you must find him not guilty.
>
> It is also the defense's theory of the case that when a defendant removes items from open water, and does not take those items for his own use or benefit or the benefit or use of others, then he lacks the intent to steal or purloin and you must find him not guilty.

The Government objected to the inclusion of "conversion language" in the proposed definition of "to steal or unlawfully take," asserting, "[w]e are not really riding on conversion here." The Government argued that § 661 does not charge conversion. Instead, it countered, the statute only covers taking and carrying, stealing, and purloining. "[The Defendants] think conversion means with the intent to, obviously, employ yourself, keep for yourself, and that is not the definition of steal or take away," the Government contended. In response, Moore and Mansell requested that the language be included, stating, "I don't think it's just a conversion," and that "the conversion of [the property], as well, is what creates the theft." Moore and Mansell specifically noted that they took the language regarding conversion of property "to one's own use or the use of another" from the pattern jury instruction for theft of an interstate shipment, which they contended was comparable to § 661.

The district court sustained the government's objection based on *Morissette v. United States*, 342 U.S. 246 (1952), reasoning that "conversion is when you get something lawfully and then you

keep it." The court noted that, regarding interstate goods theft, conversion is when someone is given property with authorization to take it but then decides to keep it: "Conversion differs from theft in that regard. And so based on *Morissette*, I don't think conversion is an issue." Moore and Mansell then argued that both § 661 and theft of interstate goods required the taking of property "for one's own possession or the possession of another" because the property covered by those statutes was "not in someone's personal home" but "in open water, or the open road," and so required "more than the simple removal of it." The court replied that was not a relevant distinction. The Government added that the geographic spot was the jurisdictional issue, noting that the words "conversion" or "to convert" had been left out of § 661, but were used in other theft and embezzlement statutes. The district court also decided to define "purloin" as "to appropriate wrongfully."

The district court instructed the jury as follows: "To steal or lawfully [sic] take means to wrongfully take property belonging to someone else with the intent to either permanently or temporarily deprive the owner of his right to the property or the use of the benefit from it." It also instructed on the definition of purloin as "to appropriate wrongfully" and stated the Defendants' theory of the case was "that the Defendants removed property without the bad purpose to disobey or disregard the law and therefore did not act with the intent to steal or purloin."

The jury deliberated for two days—longer than the actual presentation of the evidence—and sent multiple notes to the court.

23-10579                Opinion of the Court                7

It expressed it was unable to reach a unanimous decision, and the court gave an *Allen*[1] charge. After the court read the *Allen* charge, the jury submitted another note asking if there were any other defense theories. Ultimately, the jury found both Defendants guilty of the single count. The court sentenced both Defendants to a term of one year of probation.[2] As such, Moore and Mansell now have the status of convicted felons. They timely appealed.

## II.    Analysis

We note at the outset that the decision to seek the return of the indictment from the grand jury essentially rests within the discretion of the United States Attorney—those decisions may be based on pre-indictment considerations not a part of the record. Nor are we asked to determine the sufficiency of the evidence to convict. Instead, we are tasked with reviewing one issue only: whether the district court abused its discretion in issuing the jury instructions. For the reasons stated below, we find that the district court did not abuse its discretion. That ends our review, and we therefore affirm.

We review a district court's rejection of a proposed jury instruction for abuse of discretion. *United States v. Dean*, 487 F.3d 840, 847 (11th Cir. 2007) (per curiam). We find "reversible error where the requested instruction (1) was correct, (2) was not substantially covered by the charge actually given, and (3) dealt with some point

---

[1] *Allen v. United States*, 164 U.S. 492 (1896).

[2] The district court also imposed a $1,000 fine against Moore only.

in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Eckhardt*, 466 F.3d 938, 947–48 (11th Cir. 2006). "We review the legal correctness of a requested jury instruction de novo." *United States v. Takhalov*, 827 F.3d 1307, 1312 (11th Cir. 2016) (quotation marks omitted and alteration adopted). Importantly, pattern jury instructions do not hold binding authority, unlike precedential case law. *United States v. Carter*, 776 F.3d 1309, 1324 (11th Cir. 2015).[3]

Statutory interpretation begins with the text of the statute. *United States v. Garcon*, 54 F.4th 1274, 1277 (11th Cir. 2022) (en banc), *abrogated on other grounds*, *Pulsifer v. United States*, 144 S. Ct. 718 (2024). Here, the relevant statutory text provides that "[w]hoever, within the special maritime and territorial jurisdiction of the United States, takes and carries away, with intent to steal or purloin, any personal property of another shall be punished." 18 U.S.C. § 661. The Supreme Court has stated that, when interpreting federal criminal statutes "where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning." *United States v. Turley*, 352 U.S. 407, 411 (1957). However, "stealing" and "stolen" have no accepted common-law meaning and should not be likened to common-law larceny. *Id.* at 411–12.

---

[3] Both parties discuss the Circuit's pattern jury instructions in arguing their case. We do not address these arguments as they have no bearing on our decision—pattern jury instructions are not binding law.

"Freed from a common-law meaning, we should give 'stolen' the meaning consistent with the context in which it appears." *Id.* at 412–13. In the context of a statute criminalizing transportation of stolen vehicles, the Supreme Court concluded, "'[s]tolen' includes all felonious takings . . . with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." *Id.* at 417 (internal citation omitted).[4]

In *Morissette v. United States*, the Supreme Court considered an appeal of a conviction under 18 U.S.C. § 641, which stated, "'whoever embezzles, steals, purloins, or *knowingly converts*' government property is punishable by fine and imprisonment." 342 U.S. at 248 (emphasis added). It concluded that the omission of an explicit intent element in § 641 did not imply that the element did not need to be proven. *Id.* at 263. In its discussion of the history and purpose of § 641 to determine Congress's intent regarding mental state, the Court distinguished, in dicta, between stealing and conversion. *Id.* at 263–73. "Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing. 'To steal means to take away from one in lawful possession without right with the intention to keep wrongfully.'" *Id.* at 271 (quoting *Irving Tr. Co. v. Leff*, 171 N.E. 569, 571 (N.Y. 1930)).

---

[4] The Supreme Court clarified that it was using the term felonious "in the sense of having criminal intent rather than with reference to any distinction between felonies and misdemeanors." *Turley*, 352 U.S. at 410 n.4.

While our circuit has not interpreted the meaning of "steal" in the context of § 661, our predecessor Fifth Circuit considered the term's meaning in a nearly identical statute. In *United States v. Bell*, the Fifth Circuit evaluated a violation under 18 U.S.C. § 2113(b), which states, "'[w]hoever takes and carries away, with intent to steal or purloin, any property or money or any other thing of value exceeding [$1,000] belonging to . . . any bank . . . shall be . . .imprisoned.'"[5] 678 F.2d 547, 548 (5th Cir. Unit B 1982) (en banc) (quoting 18 U.S.C. § 2113(b)).[6] In interpreting whether the relevant conduct fell within § 2113(b)'s ambit, our predecessor court reaffirmed its holding in *Thaggard v. United States*, 354 F.2d 735 (5th Cir. 1965), in which it embraced the Supreme Court's definition of "steal" from *Turley* in the context of § 2113(b). *Id.* at 736–37. Several of our sister circuits have interpreted § 661 and held it is broader than the common-law definition of larceny under *Turley*.[7]

---

[5] The original monetary value included in the statute as quoted in *Bell* was $100. The bracketed text states the monetary value reflected in 18 U.S.C. § 2113(b) today.

[6] Because Eleventh Circuit judges were the same judges who decided former Fifth Circuit cases by Unit B panel and en banc, the Unit B panel decisions are binding on the Eleventh Circuit. *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (stating Unit B panels of the old Fifth Circuit are binding on the Eleventh Circuit).

[7] *United States v. Henry*, 447 F.2d 283, 285–86 (3rd Cir. 1971) (holding that "18 U.S.C. § 661 and its predecessor statutes were not codifications of the common law crime of larceny but were intended to broaden that offense," and affirming a jury instruction that defined "to steal or purloin" as "any taking whereby a person, by some wrongful act, willfully obtains or retains possession of property belonging to another without the permission or beyond any permission

In this case, the district court did not abuse its discretion in rejecting the Defendants' proposed jury instruction because the proposed instruction was not a correct interpretation of § 661. *See Dean*, 487 F.3d at 847; *Eckhardt*, 466 F.3d at 947–48. Moore and Mansell state they rely on *Morisette* and *Turley* to support the conclusion that the *lucri causa* element should apply in the context of § 661. Yet *Morisette* does not support this analysis, and applying *Turley* yields the opposite result.

First, the text of § 661 does not explicitly include any language requiring a *lucri causa* element. *See* 18 U.S.C. § 661. But Moore and Mansell's argument centers on the term "steal," which is not necessarily clear on its face, so the plain text does not require a specific outcome. *See id.*

The Supreme Court held in *Turley* that "stealing" in federal statutes is not defined by common law. 352 U.S. at 411–12. "[S]tolen" as interpreted in *Turley* includes "all felonious takings . . . with intent to deprive the owner of the rights and benefits of ownership, regardless of whether or not the theft constitutes common-law larceny." *See id.* at 417. The old Fifth Circuit found this definition applied to § 2113(b), a statute with intent language identical to § 661's. *Bell*, 678 F.2d at 548. Similarly, our sister circuits have also

given with the intent to deprive the owner of the benefit of ownership"); *United States v. Maloney*, 607 F.2d 222, 226, 231 (9th Cir. 1979) (explaining § 661 was not limited to the common-law definition of larceny and the Supreme Court's definition of "stolen" in *Turley* was applicable in the context of § 661); *see also United States v. Gristeau*, 611 F.2d 181, 184 (7th Cir. 1979) (adopting the Ninth Circuit's reasoning in *Maloney*).

interpreted *Turley*'s definition to apply to § 661.  *United States v. Henry*, 447 F.2d 283, 285–86 (3rd Cir. 1971); *United States v. Maloney*, 607 F.2d 222, 231 (9th Cir. 1979); *United States v. Gristeau*, 611 F.2d 181, 184 (7th Cir. 1979).  These cases do not indicate that the federal statutory definition of "steal" includes the idea of *lucri causa*. Moore and Mansell rely on the term "felonious" in *Turley*'s definition, but the *Turley* Court explained that it was using felonious "in the sense of having criminal intent," not to incorporate common-law terms where it previously stated they do not apply.  352 U.S. at 410 n.4, 411–12.  Moore and Mansell contend that they are not arguing that "steal" in § 661 has a common-law definition, but this is belied by the attempt to interpret § 661 by reference to common law.  The term *lucri causa* derives from the common-law definition of larceny in Blackstone, and therefore does not belong in the definition of "steal" in § 661, which is broader than the common-law definition of larceny under *Turley* and *Bell*'s reasoning.  *See id.* at 411–12; *Bell*, 678 F.2d at 548; 4 William Blackstone, *Commentaries* *229–232.

 *Morissette*, on the other hand, is not explicitly relevant to this case.  *Morisette*'s analysis centered on 18 U.S.C. § 641.  This statute included the term "convert," which, importantly, is not present in § 661.  As such, any attempts to overlay *Morisette*'s reasoning to § 661 would be inapposite.

 Moore and Mansell make much of the offhand dicta in *Morisette*: "Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing."  342 U.S. at 271.  This,

23-10579              Opinion of the Court                13

however, their case does not make. *Morissette* examined whether § 641 had a criminal-intent element despite having no *mens rea* language in its text. *Id.* at 249–50. It did not concern the interpretation of "steal" in the federal statutory context. The Supreme Court's conversation regarding the difference between stealing and conversion was to provide background context for its analysis regarding the absence of *mens rea* language in § 641—not to provide conclusive definitions of stealing and conversion. *See id.* at 263–73. This is evidenced by: (1) the Supreme Court's phraseology, "*Probably* every stealing is a conversion, but *certainly* not every knowing conversion is a stealing," and that (2) the Court cited a New York Court of Appeals decision for its definition of stealing. *Id.* at 271 (emphasis added) (citing *Leff*, 171 N.E. at 571). Both indicate that it was not crafting a generally applicable definition for "steal" within statutory interpretation, unlike in *Turley*. *See* 352 U.S. at 411–12, 417. *Turley* overtly addressed the definition of "steal" within a federal statute and considered its applicability to the common law in a general context.

Overall, *Turley* is more applicable to § 661's interpretation in this case than *Morissette*'s conditioned definition offered in an unrelated context. *See Morissette*, 342 U.S. at 271; *Turley*, 352 U.S. at 411–12, 417. Applying *Turley*, we find no basis for Moore and Mansell's contention that takings must be *lucri causa* under § 661.

### III.    Conclusion

In short, Moore and Mansell's proposed jury instruction—that the jury must find that they took the fishing gear with

the intent to keep the gear for themselves or to convert it to their own use to convict them under § 661—was incorrect.  Therefore, the district court did not abuse its discretion by rejecting it.  We affirm the district court's rejection of Moore and Mansell's proposed jury instruction.

**AFFIRMED.**

23-10579                LAGOA, J., Concurring                1

LAGOA, Circuit Judge, joined by GRANT, Circuit Judge, concurring:

I concur in full with the majority. Because I am bound to consider only the single, narrow issue raised on appeal, I join my colleagues in affirming. But I do so with reluctance, as I explain below.

John Moore, Jr., and Tanner Mansell are felons because they tried to save sharks from what they believed to be an illegal poaching operation. They are the only felons I have ever encountered, in eighteen years on the bench and three years as a federal prosecutor, who called law enforcement to report what they were seeing and what actions they were taking in real time. They are felons who derived no benefit, and in fact never *sought* to derive any benefit, from the conduct that now stands between them and exercising the fundamental rights from which they are disenfranchised. What's more, they are felons for having violated a statute that no reasonable person would understand to prohibit the conduct they engaged in.

## I.

As the majority explains, this case arose from events that occurred on a shark-tour charter boat, on which Moore was the operator and Mansell was a deckhand. I recount here only the facts most essential to my concurrence.

Camryn Kuehl is a tourist who was out for a shark tour with Moore and Mansell on August 10, 2020. She testified that, at some point during their tour, Moore and Mansell pointed out a long fishing line in the water and told Kuehl and her family that it was an

2                    LAGOA, J., Concurring                    23-10579

"illegal longline fishing line" with sharks caught on it. Moore, Mansell, Kuehl, and Kuehl's family all sprung to action, pulling the line into their boat. In the process, Moore and Mansell cut certain portions of the line to release the ensnared sharks. Shortly after they encountered the line and started working to free the sharks, someone on the boat (Kuehl did not recall who) called law enforcement to report what they were doing. Kuehl "thought [they] were doing a great thing" and shared pictures on social media reporting as much to her friends.

A Fish and Wildlife Conservation officer, Barry Partelow, testified that it was Moore who had called to report the shark-fishing line—and that he (Moore) was cutting the sharks free. Partelow told Moore to retain the gear for his investigation.

Christopher Perez, dockmaster at the nearby marina, testified that at some point on August 10, 2020, he learned that there was a pile of fishing line and gear on his dock. He instructed his employees to remove it and throw it in a dumpster, and they did.

The fishing gear turned out to be part of a shark research program, authorized by the National Oceanic and Atmospheric Administration. The owner of the boat that placed the line, Scott Taylor, and her captain, Richard Osburn, were duly permitted and approved to deploy this type of gear as part of the research initiative.

**II.**

For reasons that defy understanding, Assistant United States Attorney Tom Watts Fitzgerald learned of these facts and—taking

23-10579                LAGOA, J., Concurring                3

a page out of Inspector Javert's playbook—brought the matter to a grand jury to secure an indictment for a charge that carried up to five years in prison.  Watts Fitzgerald decided to pursue this indictment despite the following undisputed facts: Moore and Mansell (1) called law enforcement to report what they were doing, (2) were comfortable involving their tourism customers in their actions, (3) encouraged Kuehl to record what was happening, and (4) returned the gear to the marina dock as instructed.  Against the weight of all this—which, in my view, plainly suggests a good-faith mistake on Moore and Mansell's part—Watts Fitzgerald determined that this case was worth the public expense of a criminal prosecution, and the lifelong yokes of felony convictions, rather than imposition of a civil fine.[1]

To be sure, the executive branch is entrusted with "the decision whether or not to charge an individual with a criminal offense in the first place."  *In re Wild*, 994 F.3d 1244, 1260 (11th Cir. 2021).  As the Supreme Court has recognized, "the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse."  *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978).  While "[t]his broad discretion rests largely on the recognition that the

---

[1] At oral argument, the government doubled down on its decision to prosecute.  In response to the Appellants' suggestion that a civil fine would have been a more appropriate resolution in this case, the government asserted that "if someone steals a car on a military base, you don't—the proper response isn't, well, pay restitution for that.  That's a crime."  And, as Judge Grant aptly explained in the moment, "[t]hat is a silly example.  There is no comparison."

decision to prosecute is particularly ill-suited to judicial review," *Wayte v. United States*, 470 U.S. 598, 607 (1985), prosecutors are not immune from judicial criticism for their imprudent—albeit lawful—exercises of authority. And that imprudent exercise of discretion is, in my view, what occurred in this case.

### III.

Moore and Mansell were convicted of violating 18 U.S.C. § 661, which reads in relevant part:

> Whoever, within the special maritime and territorial jurisdiction of the United States, takes and carries away, with intent to steal or purloin, any personal property of another shall be punished as follows:

> If the property taken is of a value exceeding $1,000, or is taken from the person of another, by a fine under this title, or imprisonment for not more than five years, or both; in all other cases, by a fine under this title or by imprisonment not more than one year, or both.

There is no dispute that Moore and Mansell "took and carried away" the "personal property of another." That much, we can set aside. Our focus, then, narrows on "with *intent* to steal or purloin," which the government stretched to its farthest possible application in this case. Consider a few hypotheticals that shed some light on the problem of the government applying this statute in this way:

> Adam, walking along a path in a federal park, sees an elderly woman carrying a purse overflowing with cash. Adam—seeing the purse and cash—rushes up behind her, grabs the purse, and flees.

23-10579                  LAGOA, J., Concurring                  5

We would all agree that Adam has stolen from the woman within the meaning of § 661: in a federal jurisdiction, he took the property of another with bad purpose, intending to deprive her of the rights to her property. That one is simple enough.

Now imagine that Bob, walking along a path in a federal park, sees a man rush up to an elderly woman from behind, pull a gun from his pocket, and yell "Give me your purse or I'll shoot." Bob rushes the robber, yanks the gun from his hand, and ushers the old woman out of harm's way while the robber flees. Bob holds onto the gun until the police arrive, and then he turns the gun over to law enforcement.

Has Bob stolen from the robber? Under the government's theory in this case and applying § 661 as broadly as the government did here, yes, Bob has committed a felony. Bob took and carried the property of another (the gun) with the intent to deprive its owner (the robber), either permanently or temporarily, of his right to use or benefit from the property. And, again based on the government's theories and the instructions given in our case, Bob's conduct would be criminally "willful" because he intended to do the thing the law forbids: he intended to take the gun from its owner to prevent the owner from using it, and that is forbidden under § 661. Perhaps Bob would be able to take advantage of certain affirmative defenses, including self-defense or defense of another, but Bob should not have to get to that point—because Bob should not be prosecuted.

6                          Lagoa, J., Concurring                          23-10579

Imagine, now, that Bob called the police during his encounter with the robber and told the police "I just walked into an armed robbery, and I disarmed the robber, and I am holding his gun now so he cannot shoot the victim." This clear gesture of good faith would not, according to the government here, mitigate Bob's culpability or factor into its charging decision.

Finally, consider a third variation that comes the closest to our facts. Imagine that what Bob witnessed was not a genuine robbery, but a scene being acted out by some students from the local community college. The robber was not a robber at all, but the elderly woman's scene partner for drama class. Bob, of course, had no way of knowing that when he interrupted what he believed to be a violent crime. Again, under the government's theory, this genuine mistake would be of no moment, because all that matters is that Bob took the "robber's" property with the intent to deprive him of it. Perhaps it would move the needle if Bob's lawyers requested an instruction on mistake of fact, aiming to undermine the mens rea needed to convict.[2] But, again, Bob should not be prosecuted in the first instance.

_____

[2] In certain circumstances, a mistake of fact is sufficient to negate the mens rea element of a charged offense. *See, e.g.*, *Staples v. United States*, 511 U.S. 600, 607 n.3 (1994) ("Generally speaking, such knowledge is necessary to establish mens rea, as is reflected in the maxim *ignorantia facti excusat.*"); *United States v. Feola*, 420 U.S. 671, 686 (1975) (observing that, with respect to a statute prohibiting assault on a federal officer, "where an officer fails to identify himself or his purpose . . . . one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent."); § 13:2. Mistake of Fact, 1 Wharton's Criminal Law § 13:2 (16th ed.) ("Generally

## IV.

I am bound to affirm Moore and Mansell's convictions because the only issue their lawyers identified on appeal—the "conversion" jury instruction—fails to persuade, for all the reasons explained in the Majority Opinion.  But I would be remiss if I joined in affirming without commenting on the troublesome aspects of the case before us.

---

speaking, a person who engages in penalty prohibited conduct is relieved of criminal liability if, because of ignorance or mistake of fact, they did not entertain the culpable mental state required for commission of the offense.").