[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-13121

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ALHAJI JEWRU TOURAY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cr-00103-TWT-LTW-1

_____

2                        Opinion of the Court                   23-13121

Before WILLIAM PRYOR, Chief Judge, and LUCK and BRASHER, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether the district court erred by empaneling an anonymous jury, refusing to provide a multiple-conspiracies instruction, considering acquitted conduct at sentencing, and applying the same sentence to each count of conviction. A grand jury indicted Alhaji Jewru Touray based on his involvement with a drug-trafficking organization that operated in California, Georgia, and Nevada. Touray pleaded guilty to illegal reentry but not guilty to the remaining charges. Before trial, the district court *sua sponte* empaneled an anonymous jury over Touray's objection. The jury later convicted Touray of conspiracy to possess with intent to distribute less than 100 kilograms of marijuana and possession with intent to distribute marijuana. The district court sentenced Touray to 120 months of imprisonment on each count to run concurrently. Because any error in empaneling an anonymous jury was harmless and the district court did not err in instructing the jury or sentencing Touray, we affirm.

## I. BACKGROUND

On May 3, 2023, a grand jury returned a superseding indictment charging Alhaji Jewru Touray and two codefendants with several counts related to a marijuana-trafficking conspiracy. The indictment charged Touray with one count each of conspiracy to commit money laundering, 18 U.S.C. § 1956(a)(1)(B)(i), (h); illegal reentry, 8 U.S.C. § 1326(a), (b)(1); conspiracy to possess with intent

to distribute 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, 21 U.S.C. §§ 841(b)(1)(B), 846; and possession with intent to distribute a mixture and substance containing a detectable amount of marijuana, *id.* § 841(b)(1)(C). It also charged Touray with two counts of possession of a firearm in furtherance of a drug-trafficking crime. 18 U.S.C. § 924(c)(1)(A)(i). Touray pleaded guilty to the illegal-reentry count but not guilty to the remaining counts. Those counts proceeded to trial.

At a pretrial conference, the district court informed the parties that it would *sua sponte* empanel an anonymous jury. It stated that the jurors would "be identified by number only, not by name, but by number only." One of Touray's codefendants objected, stating "I will object to [the anonymous jury] process. And I'm sure that you've had such an objection before, but for the record, I'd like to object." The district court responded, "Well, I have heard the objection," and explained that its "position is that in cases involving drugs and money laundering, that's a sufficient matter of concern to the public to justify . . . using an anonymous jury." Touray joined the objection.

On the first day of trial, the district court concealed the names of the prospective jurors. But it allowed the jurors to provide their county of residence, place of employment, and some details about their immediate family. And it allowed the parties to question them about those details in *voir dire*. At the end of *voir dire*, the district court told the jurors that they would remain

anonymous throughout the trial. It explained that the anonymity would reduce the risk that outside parties would contact them:

> Sometimes criminal trials attract the attention of the media and the public. The level of interest in any particular case is unpredictable and not within my control.
>
> This case involves two Defendants and may continue . . . for the rest of this week.
>
> It may attract attention. It may not. I just don't know. But there may be curiosity about the participants, the lawyers, witnesses, Defendants, Judge, and perhaps even the jurors.
>
> People may ask questions to learn more about the case. Even though these questions may be well-intentioned, they may still distract you from your duties as a juror. These questions can be awkward or inconvenient for you, your family, and your friends. They can be part of unwanted and improper approaches toward you from outside the courtroom.
>
> During your service as a juror, you must not discuss the case with anyone, and even after the case is finished you will never be required to explain your verdict or jury service to anyone.
>
> Your names and personal information will be known only to the court personnel and will not be disclosed.

At the end of the first day of trial, outside of the presence of the jury, the district court explained its custom of empaneling an anonymous jury whenever the case involves organized crime or weapons charges:

> So I think under current Eleventh Circuit law, I have to give some justification for picking an anonymous jury, and my justification in this case is as follows: . . .

> I typically do pick an anonymous jury when the allegations of the Indictment are that there's any sort of organized criminal activity where the jurors might think that if the allegations are true, that there might be other unindicted [persons] or other co-conspirators who might be in a position to contact them if their identities were known.

> And I also pick anonymous juries in any case involving weapons charges, where the jurors might think there might be some threat to their personal safety.

> And both of those circumstances are here and that's why I'm selecting an anonymous jury.

Touray renewed his objection to the anonymous jury.

At trial, the government presented evidence that Touray was involved in a multistate drug-trafficking conspiracy. In late 2018 and early 2019, federal agents discovered that Touray and his family members were ferrying large amounts of cash between Georgia, California, and Nevada. In one instance, agents stopped Touray in the Atlanta airport and found $73,975 bundled in stacks of about

$1,000 in bags that smelled of marijuana. In another, agents stopped Touray's relative at the same airport carrying $66,060. Agents later monitored that relative, conducted a search when he attempted to leave the country, and seized and searched his cellphone. The cellphone search revealed text messages about purchasing marijuana, texts between Touray and the relative, records that showed Touray bought the relative at least one airline ticket, and several flights between Georgia, California, and Nevada. One text provided the relative with the address 1354 Spring Hill Drive, Pittsburg, California.

Agents also tracked Touray's wife as she registered for a mailbox at a UPS store in Reno, Nevada. Although she never returned to the mailbox, a sheriff's deputy in Nevada later conducted a traffic stop of another of Touray's relatives and, upon searching the vehicle, found documents with Touray's name and a letter about the mailbox contract in Touray's wife's name.

In February 2020, an informant cooperating with federal agents contacted Touray. The informant inquired about purchasing marijuana, and Touray replied that he sold marijuana for $1,750 in Atlanta, but $1,450 or $1,500 in California. Touray bragged that he could sell a thousand pounds "in two hours." The informant spoke with other associates of Touray and arranged to purchase marijuana at a house at 7541 Hilltop Way, Atlanta, Georgia.

On the day of the scheduled transaction, federal agents arrived at and searched the Atlanta residence. They discovered two people, several large packages of marijuana weighing about

55 kilograms, a money counter, a drug ledger, two handguns, digital scales, approximately $30,000 in cash, and several documents in Touray's name.

A few days earlier, federal agents searched trash stored outside of the residence at 1354 Spring Hill Drive in Pittsburgh, California. They discovered documents belonging to Touray's wife, along with small plastic bags, marijuana residue, and a receipt with Touray's name on it. When agents later searched inside the residence on the same day as the Atlanta search, they found Touray and another individual, additional packaging material, firearms, two cellphones, and Touray's passports and driver's license that listed the Atlanta address. The agents confirmed that the two cellphones were connected to the numbers that Touray's relative and the informant had used to contact him. They also interviewed Touray, and when they asked him about the marijuana in the Atlanta residence, he stated that he "claim[ed] for it." He also admitted to running a marijuana business in California.

Touray testified in his own defense. He explained that he is a Gambian national and that he lived in Georgia from 1999 to 2013 before moving to California. Touray admitted that he had connections to marijuana sales in California and Georgia, and that his family maintained possession of the house in Atlanta. But he denied any involvement with the marijuana and guns found in the Atlanta house in 2020 or with any agreements to sell marijuana in Atlanta.] He instead stated that he was involved in "petty trade in California locally." He denied ever flying with money that constituted drug

proceeds but admitted to arranging to sell the informant 50 pounds of marijuana in Georgia.

After the close of evidence, Touray requested a jury instruction on multiple conspiracies. The proposed text offered Touray's defense theory that "there were multiple conspiracies" and "[p]roof of several separate conspiracies isn't proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies proved is the single overall conspiracy." "You must decide," it continued, "whether the single overall conspiracy charged existed between two or more conspirators" and "who the conspirators were." Finally, the proposed instruction stated that "to find a Defendant guilty, you must all agree that the Defendant was a member of the conspiracy charged—not a member of some other separate conspiracy."

The government objected to this instruction because the substance was already covered in the other instructions on conspiracy and because the addition might confuse the jury. The district court agreed with both arguments and declined to give the proposed instruction.

The parties then offered closing statements. Touray argued that the government had not proved an "agreement for this wholesale distribution of marijuana throughout the country." Instead, he said he intended to "set[] up a legal marijuana business" in California, and had only past or family connections to the house in Atlanta.

After both parties rested, the district court instructed the jury. As to the drug conspiracy count, the district court told the jury:

> A Defendant can be found guilty only if all of the following facts are proved beyond a reasonable doubt:
>
> One, two or more people in some way agreed to try to accomplish a shared and unlawful plan, the object of which was to possess with the intent to distribute marijuana; and,
>
> Two, the Defendant knew the unlawful purpose of the plan and willfully joined in it.
>
> A person may be a conspirator even without knowing all of the details of the unlawful plan or the names and identities of all the other alleged conspirators.
>
> If a Defendant played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan and willfully joined in the plan on at least one occasion, that's sufficient for you to find the Defendant guilty.
>
> But simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests doesn't establish proof of a conspiracy. Also, a person who doesn't know about a conspiracy but happens to act in a way that advances some purpose of one doesn't automatically become a conspirator.

The district court also instructed the jury that Touray was "on trial only for the specific crimes charged in the Indictment," adding that the jury should "determine from the evidence in this case whether [Touray] is guilty or not guilty of those specific crimes."

The jury found Touray guilty of conspiracy to possess with intent to distribute less than 100 kilograms of marijuana—a lesser included offense—and of possession with intent to distribute marijuana. It found Touray not guilty on the money-laundering-conspiracy and firearm-possession counts.

A presentence investigation report was prepared. It attributed 688.69 kilograms of marijuana to Touray based on the weight of marijuana seized in the California and Georgia residences and the amounts of cash that Touray and his coconspirators carried, calculated into drug weight based on the $1,750 per pound price that Touray quoted to the informant.

Using the 2021 United States Sentencing Commission Guidelines Manual, the report also grouped Touray's illegal-reentry conviction into one group and his conspiracy and possession convictions into a second group. It calculated his offense levels to be 8 for the first group and 36 for the second. Touray's group two offense level included an enhancement for obstruction of justice. The report detailed that Touray called his wife and "instructed [her] to contact and/or threaten witnesses" and to "transfer[] assets . . . to other individuals." Relying on the greater offense level—36— and a criminal history category of I, the report calculated a guideline sentence range of 188 to 235 months of imprisonment. The

statutory maximum sentence for Touray's illegal-reentry count was 120 months of imprisonment.

Touray objected that the report relied on acquitted conduct or evidence not presented at trial to calculate the drug weight for sentencing. And he filed a sentencing memorandum that requested a downward variance of 60 months of imprisonment.

At sentencing, the district court heard argument on the drug quantity calculation in the report. The district court determined that the government had shown by a preponderance of the evidence that Touray was responsible for at least 190 kilograms of marijuana based on the "large-scale drug traffick[ing]" at issue, concluding that the estimate was likely "very, very, very conservative." Based on the newly calculated drug quantity, the district court reduced the offense level for Touray's group two offenses to 34, resulting in a guidelines range of 151 to 188 months of imprisonment.

The district court sentenced Touray to 120 months of imprisonment and three years of supervised release as to each convicted count, including the illegal-reentry count, to run concurrently. It explained that it sentenced him below the guidelines range because it thought that the guidelines "overstate[d]" his "criminal responsibility, considering the sentencing factors set forth in" 18 U.S.C. § 3553(a). Touray renewed his objections based on the use of acquitted conduct, the calculation of the guideline range, and the reasonableness of the sentence. The district court overruled those objections.

We appointed Sydney Strickland to represent Touray on appeal. We thank her for ably discharging her duties.

## II. STANDARDS OF REVIEW

Several standards govern our review in this appeal. We review the decision to empanel an anonymous jury for abuse of discretion. *United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir. 1994). The government argues that we should instead review for plain error because Touray's objections were not sufficiently specific. To preserve an error for review, a party must object "in such clear and simple language that the trial court may not misunderstand it." *United States v. Massey*, 443 F.3d 814, 819 (11th Cir. 2006) (citation and internal quotation marks omitted). As long as "the issue . . . was adequately presented to the district court," our normal standard of review will apply. *Id.* And our "[p]recedent is clear that while an issue can be waived, alternative arguments on an issue cannot." *United States v. Horn*, 129 F.4th 1275, 1298 (11th Cir. 2025) (holding that where a defendant "repeatedly asked the district court" to alter its sentencing calculation and "raise[d] the same issue" on appeal, but "rel[ied] on a different line of precedent," he nonetheless preserved the issue). Touray objected to the use of an anonymous jury both at the pretrial conference and at trial. And the district court understood his objection when it explained its reasons for using the anonymous jury. The record reflects that the issue "was adequately presented to the district court," *Massey*, 443 F.3d at 819, so we review for abuse of discretion.

We review the rejection of a proposed jury instruction for abuse of discretion. *United States v. Moore*, 115 F.4th 1370, 1374 (11th Cir. 2024).

We review constitutional challenges to sentences *de novo. United States v. Longoria*, 874 F.3d 1278, 1281 (11th Cir. 2017), *abrogated on other grounds by Erlinger v. United States*, 144 S. Ct. 1840 (2024). The government again argues that we should review for plain error because Touray failed to raise his constitutional challenge to the use of acquitted conduct at sentencing. But we disagree. And although Touray did not mention the basis for his objection, the district court understood the objection and rejected it because the controlling "case law is clear." So plain error does not apply.

Finally, we review the substantive and procedural reasonableness of a sentence for abuse of discretion. *United States v. Oudomsine*, 57 F.4th 1262, 1264, 1266 (11th Cir. 2023) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)).

## III. DISCUSSION

We divide our discussion into four parts. First, we explain that any error in empaneling an anonymous jury was harmless. Second, we explain that the district court did not abuse its discretion by rejecting Touray's requested instruction on multiple conspiracies. Third, we explain that the district court did not err in considering acquitted conduct at sentencing. Finally, we explain that the district court did not err by sentencing Touray to 120 months of imprisonment on all convicted counts.

A. *Any Error in Empaneling an Anonymous Jury Was Harmless.*

Touray argues that the district court abused its discretion in empaneling an anonymous jury because it failed to consider whether there was "a strong reason to believe the jury need[ed] protection" or to take "reasonable precautions to minimize any prejudicial effects on the defendant." He contends that the decision undermined his right to a presumption of innocence. We disagree. Although the district court offered insufficient reasons for empaneling an anonymous jury, any error was harmless.

A district court may empanel an anonymous jury if "the interests of justice so require." 28 U.S.C. § 1863(b)(7). But even with this statutory grant, "the empanelment of an anonymous jury is a drastic measure, one which should be undertaken only in limited and carefully delineated circumstances." *Ross*, 33 F.3d at 1519; *see also United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1033 n.24 (11th Cir. 2005) (citing statutory authority for empaneling anonymous juries). The practice is circumscribed because "[a]n anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence." *Ross*, 33 F.3d at 1519. And "[t]he presumption of innocence is 'undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.'" *Id.* (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)).

In *United States v. Ross*, we adopted the following rule fashioned by the Second Circuit for determining when an anonymous

jury is appropriate: "'In general, the court should not order the empaneling of an anonymous jury without (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected.'" *Id.* at 1520 (quoting *United States v. Paccione*, 949 F.2d 1183, 1192 (2d Cir. 1991)). And we outlined the "combination of several factors" that could supply a strong basis for believing that the jury needed protection:

> (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation or harassment.

*Id.* We offered as examples the appeal from the Second Circuit, where four of the five factors were present, and another from the Seventh Circuit, where at least three factors were present. *Id.* (discussing *Paccione*, 949 F.2d at 1192–93, and *United States v. Crockett*, 979 F.2d 1204, 1216 (7th Cir. 1992)). A district court does not abuse its discretion when a "combination of these factors supports [the] conclusion that the jury need[s] special protection." *Ochoa-Vasquez*, 428 F.3d at 1035.

"Two concerns underlie the limitation on when a district court may empanel an anonymous jury: (1) that anonymity will inhibit the meaningful exercise of preemptory challenges; and (2) that anonymity will diminish the presumption of innocence." *United States v. LaFond*, 783 F.3d 1216, 1223 (11th Cir. 2015) (citation and internal quotation marks omitted). We have explained that two procedures can protect the defendant's fundamental rights. First, "[w]here jury anonymity is warranted, the defendant's fundamental right to an unbiased jury is sufficiently guaranteed by the court's conduct of a voir dire that can uncover any bias" from a juror. *Ross*, 33 F.3d at 1520. Second, "the danger that the jury might infer that the need for anonymity was attributable to the defendant's character is minimized when the trial court gives the jurors a plausible and nonprejudicial reason for hiding their identities." *Id.* Because the district court conducted a sufficient *voir dire*, Touray does not argue that the anonymous jury affected his exercise of preemptory challenges. He instead argues that the anonymous jury undermined his presumption of innocence.

Four of our precedents guide how district courts should apply the *Ross* factors. In *Ross* itself, the defendant was "the leader of a large-scale criminal organization, . . . actively involved in organized crime"; his "organization had the means to harm jurors and had in fact committed prior acts of violence"; he "had previously attempted to interfere with the judicial process by ordering the death of . . . a potential witness against" him; there had been acts of violence against the relatives of potential witnesses and bribes of other potential witnesses; and he faced a potential life sentence.

33 F.3d at 1520–21 & n.25. And the district court "took reasonable steps to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights were protected" by explaining to the jury that "it wanted to insulate them from improper communication from either side and that its decision was no reflection on the defense." *Id.* at 1521. In *United States v. Bowman*, "all of the *Ross* factors were present to some degree." 302 F.3d 1228, 1238 (11th Cir. 2002). The defendant belonged to a motorcycle gang that had "intimidate[d] witnesses"; he was accused of kidnapping and murder and faced a life sentence; and his "capture and trial had already garnered a significant amount of publicity," so even if the gang "had no history of juror intimidation, jurors had been accosted by members of the news media in prior trials involving the [gang]." *Id.* at 1238–39. In *United States v. Ochoa-Vasquez*, the "evidence supported all five of the *Ross* factors." 428 F.3d at 1034. The drug traffickers there had "establish[ed] a group to kill suspected informants," the defendant "faced a lengthy sentence," and his prior connections to a cartel made the trial "high-profile." *Id.* at 1035. This "combination of . . . factors support[ed] a conclusion that the jury needed special protection." *Id.* And in *United States v. LaFond*, "[a]t least three factors supported the decision to empanel an anonymous jury." 783 F.3d at 1223. Both defendants were members of "racist gangs," their "gang affiliations" raised a concern that they "might know people outside of the courthouse . . . who would have the ability to harm jurors," and both faced "potential life sentences." *Id.* (alteration adopted) (internal quotation marks omitted). We held that although the district court did not cite any circuit

precedents, it "made its decision within the proper framework" and "there was a strong reason to believe the jury needed protection." *Id.* at 1223–24 (alterations adopted) (citations and internal quotation marks omitted). And its explanation that it was "following its standard rule . . . to prevent identity theft" by empaneling an anonymous jury "minimized any prejudicial effect." *Id.* at 1224 (internal quotation marks omitted).

The district court failed to engage in the kind of analysis required by our precedents. Instead of reviewing the *Ross* factors, it announced that "cases involving drugs and money laundering . . . [are] a sufficient matter of concern to the public to justify . . . using an anonymous jury." At trial, it elaborated that, in its view, "*any sort* of organized criminal activity where the jurors might think that . . . there might be other unindicted [persons] or other co-conspirators who might be in a position to contact them," and "*any case* involving weapons charges, where the jurors might think there might be some threat to their personal safety," would support empaneling an anonymous jury.

No precedent embraces the general practice of the district court empaneling an anonymous jury based solely on the type of crime and the concern that "jurors might think" there could be some threat to them. The district court considered the facts of this indictment only at a high level of generality when it observed that the indictment involved "organized criminal activity" and "weapons charges." It offered no analysis or evidence to suggest that it had considered whether the "limited and carefully delineated

circumstances" that warrant an anonymous jury were present. *Ross*, 33 F.3d at 1519. And it made no finding that there was any "strong reason" to conclude that "that the jury needed special protection." *Ochoa-Vasquez*, 428 F.3d at 1034–35 (citation and internal quotation marks omitted). Our precedents required the district court to focus on the specific dangers to the jurors and the need to protect the defendant's presumption of innocence. It failed to do so.

Nevertheless, the district court took steps "to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." *See Ross*, 33 F.3d at 1520 (citation and internal quotation marks omitted). The parties ensured that the jury was unbiased through *voir dire*, as the jurors offered several personal details and the district court allowed counsel to ask a few follow-up questions. And the district court offered the jurors a neutral reason for their anonymity when it explained that "[s]ometimes criminal trials attract the attention of the media and the public," leading to "unwanted and improper approaches toward [the jurors] from outside the courtroom" that could "distract" the jurors from their duties or be "awkward or inconvenient" for them. The district court bookended that explanation by informing the jurors that they would remain anonymous throughout the trial and that their "names and personal information w[ould] be known only to the court personnel and w[ould] not be disclosed."

Touray argues that any error in empaneling an anonymous jury was structural and that we should presume prejudice. But

structural-error review is reserved for the "rare circumstances" where the "effects" of a constitutional error "are unmeasurable" such that the error "completely undermine[s] the reliability of a trial to serve as a vehicle for determination of guilt or innocence." *United States v. Margarita Garcia*, 906 F.3d 1255, 1264 (11th Cir. 2018) (citations and internal quotation marks omitted). Because the district court had statutory authority to empanel an anonymous jury, *see* 28 U.S.C. § 1863(b)(7), and because our precedents reveal that an anonymous jury is permissible when certain factors are met, we cannot say that any error in empaneling the anonymous jury completely undermined the reliability or function of Touray's trial. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148–49 (2006) (listing as structural errors "the denial of counsel, the denial of the right of self-representation, the denial of the right to a public trial, and the denial of the right to a jury trial by giving a defective reasonable-doubt instruction" (citations omitted)). So we review for harmless error and vacate Touray's convictions only if the error "affect[ed his] substantial rights." 28 U.S.C. § 2111; FED. R. CRIM. P. 52(a). The government bears the burden of establishing that the error is harmless. *United States v. Pon*, 963 F.3d 1207, 1227–28 (11th Cir. 2020).

The record here reveals that any error in failing to appropriately consider the *Ross* factors was harmless because at least three of the factors were present. First, evidence at trial suggested that there may have been several additional members of the conspiracy who were unindicted and apparently not in custody. In *LaFond*, we held that the second *Ross* factor was satisfied where "the district

court was concerned that the defendants might 'know people out-side of the courthouse' based on their gang affiliations who would have the ability to harm jurors." 783 F.3d at 1223 (alteration adopted). So too here. Although it was not enough for the district court to state that the "*jurors* might think" other members of the conspiracy were still at large with the capacity to contact them, the record supports the finding that *the court* had those concerns. *See id.* The conspiracy involved many family members and associates, some of whom may not have been named, known, or in custody. Second, Touray faced a potentially decades-long sentence. And third, there was evidence that Touray attempted to tamper with a witness while he awaited trial by instructing his wife to contact an unknown coconspirator. Because the record satisfied three of the *Ross* factors and the district court mitigated any prejudice by offer-ing a neutral reason for the jurors' anonymity, any error was harm-less.

### B. *The District Court Did Not Abuse Its Discretion in Rejecting the Multiple-Conspiracies Instruction.*

Touray argues that the district court erred in refusing to give his requested instruction about multiple conspiracies because the evidence at trial supported the inference that there were two sepa-rate conspiracies—one in California and one in Georgia—instead of one conspiracy involving both locations. He contends that the proposed instruction followed the pattern jury instruction on mul-tiple conspiracies, that the requested instruction was not covered by the instructions given by the district court, and that the failure to give the requested instruction substantially impaired his ability

to present his defense. The government responds that the jury instructions accounted for the possibility of multiple conspiracies and prevented the jury from convicting based on an unindicted conspiracy. The government has the better argument.

District courts have "broad discretion in formulating [their] instructions," but "a defendant is entitled to an instruction relating to a theory of defense so long as there is some evidential foundation." *United States v. Vereen*, 920 F.3d 1300, 1306 (11th Cir. 2019). "In order for the denial of a requested instruction to constitute reversible error," Touray "must establish three things: that the request correctly stated the law; that the charge given did not substantially cover the proposed instruction; and, finally, that the denial substantially impaired the defendant's ability to present an effective defense." *Id.*

When a defendant requests an instruction about multiple conspiracies, the instruction is appropriate if "the indictment charges several defendants with one overall conspiracy, but the proof at trial indicates a jury could reasonably conclude that some of the defendants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment." *United States v. Chastain*, 198 F.3d 1338, 1350 (11th Cir. 1999). To determine whether an instruction for multiple conspiracies should be given, the district court must "consider[] whether there is sufficient evidence for a reasonable jury to conclude that some of the defendants were involved in separate conspiracies unrelated to the overall conspiracy charged in the indictment." *Id.* We have stated that we

"doubt" that an instruction "is ever appropriate where there is sufficient evidence to establish a defendant's membership in at least one conspiracy within the scope of the indictment." *United States v. Richardson*, 532 F.3d 1279, 1290 (11th Cir. 2008).

In *United States v. Calderon*, we held that where "the instructions given by the [district] judge adequately informed the jury that in order to convict, it must find that each appellant joined in *the* conspiracy charged," the "instruction was sufficient to inform the jury that it could convict only if the government proved that each defendant was a member of the conspiracy alleged in the indictment and not any other." 127 F.3d 1314, 1329–30 (11th Cir. 1997). Because that instruction sufficiently covered the defendants' multiple-conspiracies theory, we held that the district court did not reversibly err. *Id.* at 1330.

Even if there had been sufficient evidence to support a reasonable inference of more than one conspiracy, the instructions given by the district court correctly stated the law and covered the matter. The district court told the jury that it could convict Touray only if it found that he was guilty of "the *specific crimes* charged in the Indictment." It stated that Touray would only be guilty of the conspiracy charge if he "underst[ood] . . . the unlawful purpose of the plan and willfully joined in the plan." And it told the jury that "simply being present at the scene of an event or merely associating with certain people and discussing common goals . . . doesn't establish proof of a conspiracy." Each of these instructions made clear to the jury that it could convict Touray only if it found him

guilty of participating in the conspiracy alleged in the indictment. Touray cannot establish that "the charge given did not substantially cover the proposed instruction." *Vereen*, 920 F.3d at 1306.

Nor did the failure to give the proposed instruction prejudice Touray's substantial rights. To find that Touray suffered prejudice from the refusal to give his requested instruction, "we would have to conclude that the evidence of multiple conspiracies was so strong that the jury would probably have acquitted [him] of the conspiracy charges had it been given the tendered instruction." *Calderon*, 127 F.3d at 1330. Touray argued at closing that although he was involved in marijuana distribution in California, he was not involved in the conspiracy trafficking marijuana and drug proceeds between California and Georgia. His testimony also supported this theory. So Touray's ability to present his defense was not impaired. After reviewing the evidence presented against Touray, we cannot say that the jury probably would have acquitted him had it received the requested instruction.

## C.  The District Court Did Not Err in Considering Acquitted Conduct at Sentencing.

Touray next argues that the district court violated his Fifth and Sixth Amendment rights by considering acquitted conduct at sentencing when it calculated the relevant drug weight based on the amount of cash seized at airports during the investigation. The government responds that controlling precedent establishes that district courts may consider acquitted conduct at sentencing. The government has the better argument.

In *United States v. Culver*, we stated that "[i]t is well-settled that a sentencing court may consider conduct for which a defendant has been acquitted if the government proves the conduct in question by a preponderance of the evidence." 598 F.3d 740, 752 (11th Cir. 2010). So long as the sentence imposed by the district court does not "exceed the sentence authorized by the jury verdict" and is supported by a preponderance of the evidence, it does not violate the Fifth or Sixth Amendments to consider acquitted conduct at sentencing. *Id.* at 752–53; *cf. United States v. Perry*, 14 F.4th 1253, 1277 (11th Cir. 2021) (stating that relevant conduct for sentencing purposes need not even be indicted, and that "a district court may consider *uncharged* conduct if it finds that the government proved the conduct by a preponderance of the evidence" (emphasis added)). Moreover, the Sentencing Guidelines the district court used to sentence Touray also allowed the consideration of acquitted conduct, United States Sentencing Guidelines Manual § 1B1.3 (Nov. 2021), although a 2024 amendment to the Guidelines eliminated acquitted conduct from the "relevant conduct" calculations, United States Sentencing Guidelines Manual § 1B1.3 (Nov. 2024). *See United States v. Jerchower*, 631 F.3d 1181, 1184 (11th Cir. 2011) (stating that "[i]n reviewing the district court's application of the Guidelines, this Court applies the version of the guidelines in effect on the date of the sentencing hearing," considering later amendments only to the extent that they clarify, not alter, the meaning of the guideline (alteration adopted) (citation and internal quotation marks omitted)). The district court did not err.

### D.  The District Court Did Not Err by Sentencing Touray to 120 Months of Imprisonment on All Convicted Counts.

Touray last argues that his 120-month sentence on his illegal-reentry count was substantively and procedurally unreasonable. He contends that the sentence was substantively unreasonable because, but for the guidelines' directive to sentence all concurrent counts to the same total punishment, U.S.S.G. § 5G1.2(b) (Nov. 2021), his guideline range for the illegal-reentry count would have been zero to six months of imprisonment. And he submits that the district court procedurally erred by failing to explain adequately why it imposed the statutory-maximum sentence for his illegal-reentry count. The government responds that Touray's total sentence was below the guideline range and substantively reasonable and that it was not procedural error for the district court to offer an explanation only for the total sentence, instead of each individual count of conviction. We agree with the government.

We will consider a sentence substantively unreasonable only if we are "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the [section] 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (citation and internal quotation marks omitted). "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Id.* at 1189

(citation and internal quotation marks omitted). It is generally sufficient for the district court to state that it has considered the section 3553(a) factors if it articulates enough of its reasoning to establish that it "has considered the parties' arguments and has a reasoned basis for exercising [its] own legal decisionmaking authority." *Rita v. United States*, 551 U.S. 338, 356–57 (2007).

Touray argues that his illegal-reentry sentence was substantively unreasonable because the guideline range for that count alone would have been only up to six months of imprisonment, so the 120-month sentence was a substantial upward variance from the guidelines. But the guidelines clearly state that the district court should calculate the "*total* punishment" when a defendant is convicted on multiple concurrent counts. U.S.S.G. § 5G1.2(b) (Nov. 2021) (emphasis added). And they explain that the district court "shall impose that total punishment on each [concurrent] count, except to the extent otherwise required by law." *Id.*

Moreover, we review the total sentence, not the individual count of conviction, for substantive unreasonableness. *See United States v. Rodriguez*, 34 F.4th 961, 976 (11th Cir. 2022) ("We consider whether the sentence as a *whole* is reasonable, rather than applying the reasonableness standard to *each individual* decision made during the sentencing process." (citation and internal quotation marks omitted)); *cf. United States v. Fowler*, 749 F.3d 1010, 1015 (11th Cir. 2014) (explaining that "sentencing on multiple counts is an inherently interrelated, interconnected, and holistic process which requires a court to craft an overall sentence—the 'sentence

package'—that reflects the guidelines and the relevant [section] 3553(a) factors").

Here, the district court explained that it was "sentencing [Touray] below the guideline range because" it thought "that the guideline range . . . overstate[d his] criminal responsibility, considering the sentencing factors set forth in" section 3553(a), "specifically the nature and circumstances of the offense, and the history and characteristics of" Touray. That articulation suffices to explain why Touray's total sentence was substantively reasonable. That his illegal-reentry conviction, had it stood alone, would not have received so great a sentence is irrelevant under our "holistic" approach to sentencing. *Fowler*, 749 F.3d at 1015.

Nor did the district court procedurally err. Touray contends that the district court should have explained why it was sentencing him to 120 months of imprisonment on the illegal-reentry count specifically. But Touray points to no precedent requiring that the district court give separate reasons for his sentence on each count of conviction.

The district court explained that it considered the illegal-reentry count as part of its sentence. It considered that count in the calculation of the guideline range, and it explained that Touray would be turned over to immigration authorities upon his release from prison. This treatment of the illegal-reentry count was procedurally reasonable.

## IV. CONCLUSION

We **AFFIRM** Touray's convictions and sentence.